**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | | |
|---|---|---|
| KATE RUSSELL, MICHELLE HEINZ, HARMONY MARTIN, ASHLEY CALI, JENNIFER COSTELLO, ALEISHA KELLEY, STACIE ISAACS, DIANA FERRARA, and NICOLE LEDVINA, individually, and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>THE COMPLETE PLAN, INC. d/b/a TEAM TRAVEL SOURCE,<br><br>*Defendant.* | ) | Case No. 3:26-cv-360-CHB<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Kate Russell, Michelle Heinz, Harmony Martin, Ashley Cali, Jennifer Costello, Aleisha Kelley, Stacie Isaacs, Diana Ferrara, and Nicole Ledvina, on behalf of themselves and all others similarly situated, by and through their attorneys, bring this class action, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all matters against Defendant, against The Complete Plan, Inc. d/b/a Team Travel Source ("Team Travel Source," "TTS," or "Defendant"), for violations of: (1) Kentucky Consumer Protection Act, Kentucky Revised Statutes ("KRS") § 367.170 *et seq.* ("KCPA"); (2) California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750–1784 ("CA CLRA"); (3) California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("CA UCL"); (4) California False Advertising Law, Cal. Bus. & Prof. Code, § 17500 *et seq.* ("CA FAL"); (5) New York General Business Law § 349 (Deceptive Acts and Practices) ("NY GBL § 349"); (6) New York General Business Law § 350

(False Advertising) ("NY GBL § 350"); (7) Oklahoma Consumer Protection Act, 2025 Oklahoma Statutes § 15-751 *et seq.* ("OK CPA"); (8) Virginia Consumer Protection Act, Va. Code § 59.1-200 ("VA CPA"); (9) Massachusetts General Laws Chapter 93A ("MCPA"), (10) Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §§ 505/1 *et seq.* ("ICFA"), and (11) unjust enrichment, and in support state as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this action to challenge Defendant's deceptive, unconscionable, and unfair practice of coercing parents into reserving lodging via Defendant's platform in connection with "Stay-to-Play" youth sporting events, charging mandatory junk fees[1] for those reservations, and misrepresenting the nature of those junk fees.

2. Defendant falsely tells consumers that they must book hotel stays via Defendant's platform in order for their children to participate in affiliated events and misrepresents the reason behind the "Stay-to-Play" policy, thereby leading consumers to believe that (a) they have no choice but to book via Defendant's platform, and (b) they benefit from a policy that in fact harms them. Defendant then tacks on mandatory junk fees that have little to no added value to consumers and misrepresents the nature of those fees during the booking flow.

3. Defendant also falsely advertises a "Lowest Rate Guarantee" to make it appear as though consumers will achieve the lowest possible rate by booking their hotel stay via Defendant's platform. Defendant's "guarantee" is illusory, however, because the rate Defendant uses for

---

[1] As defined by the FTC, "Junk Fees" are "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer." Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified at 16 C.F.R. pt. 464), available at https://www.federalregister.gov/documents/2022/11/08/2022-24326/unfair-or-deceptive-fees-trade-regulation-rule-commission-matter-no-r207011 [https://perma.cc/2NKH-M3DJ] (cleaned up).

comparison does not factor in the junk fees, and the "guarantee" does not apply to rates offered by other third-party platforms. Additionally, as detailed below, even when consumers can find a lower rate by booking directly with the same hotel, Defendant's "guarantee" does not result in a downward price adjustment for consumers.

4. Plaintiffs bring this action to provide a remedy to the thousands, if not millions, of families across the United States who have been harmed by Defendant's unlawful practices.

## PARTIES, JURISDICTION, AND VENUE

5. Plaintiff Kate Russell is an individual citizen of the Commonwealth of Kentucky.

6. Plaintiff Michelle Heinz is an individual citizen of the Commonwealth of Kentucky.

7. Plaintiff Harmony Martin is an individual citizen of the State of California.

8. Plaintiff Ashley Cali is an individual citizen of the State of California.

9. Plaintiff Jennifer Costello is an individual citizen of the State of New York.

10. Plaintiff Aleisha Kelley is an individual citizen of the State of Oklahoma.

11. Plaintiff Stacie Isaacs is an individual citizen of the Commonwealth of Virginia.

12. Plaintiff Diana Ferrara is an individual citizen of the Commonwealth of Massachusetts.

13. Plaintiff Nicole Ledvina is an individual citizen of the State of Illinois.

14. Defendant The Complete Plan, Inc. is a Kentucky corporation doing business as Team Travel Source. Defendant's principal place of business is in Louisville, Kentucky.

15. Defendant may be served through its registered agent, April Danielle LaFramboise at 12910 Shelbyville Road, Suite 2015, Louisville, KY 40243.[2]

---

[2] Kentucky Secretary of State, *Business Entity Search: The Complete Plan, Inc.* https://sosbes.sos.ky.gov/BusSearchNProfile/Profile.aspx?ctr=769384 (last visited Feb. 27,

16. Jurisdiction is proper in this Court as the alleged violations occurred in this district, Defendant's principal place of business is in this district, and Defendant purposefully avails itself of the laws, protections, and advantages of doing business in Kentucky.

17. This Court has original jurisdiction over the action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interests and costs, and at least one member of the proposed class is a citizen of a different state than Defendant.

18. Venue is proper because a substantial portion of the events alleged herein occurred within this district.

## PLAINTIFFS' ALLEGATIONS

### A. Youth Sports Inflation Is "Out of Control."

19. Youth sports in the United States have become big business. The estimated annual revenue of the youth sports sector ballooned to $40 billion in 2025, more than the annual revenue of the NFL and NBA combined.[3]

20. Parents are feeling the pinch. According to a survey conducted by the Aspen Institute's Sports and Society Program in partnership with Utah State University and Louisiana Tech University (the "Aspen Survey"), family spending on youth sports increased 46 percent from 2019 to 2024, twice the rate of price inflation in the broader economy during the same period.[4]

---

2026).

[3] Todd C. Frankel, *The Soaring Price of Youth Sports: $50 to Try Out, $3,000 to Play*, Wash. Post (Jan. 7, 2026), https://www.washingtonpost.com/business/2026/01/07/youth-sports-cost-parents-investors-profit (last visited Feb. 25, 2026).

[4] Jon Soloman, *Project Play survey: Family spending on youth sports rises 46% over five years*, Aspen Institute (March 3, 2025), https://projectplay.org/news/2025/2/24/project-play-survey-family-spending-on-youth-sports-rises-46-over-five-years (last visited Feb. 25, 2026).

The average family paid nearly $1,500 for one child's sports experiences in 2024, and the cost for families with more than one child participating in a sport was undoubtedly higher.[5] Nearly 60 percent of parents described youth sports as a financial strain according to a 2022 Lending Tree survey.[6]

21. The Aspen Survey noted that increased spending on travel and lodging for non-local play was among the factors that drove up the overall costs of youth sports.[7]

22. The dramatic increase in costs has led to a widening income gap in youth travel sports. Youth players from households earning $100,000 or more per year are two times more likely to play travel sports than those from homes making under $50,000.[8]

23. According to Tom Farrey, executive director of Aspen's Sports & Society Program, "Youth sports inflation is out of control and no segment of the population is untouched."[9]

**B. Team Travel Source Engages in "Vulture Practices" that Exploit Parents, Restrict their Lodging Choices, and Drive Up Costs.**

24. A growing number of youth sports tournaments and events impose a "Stay-to-Play" policy.

25. On its website, TTS explains the "Stay-to-Play" policy as follows:

> Stay-to-Play means that in order to participate in the tournament or event, teams and athletes must stay in one of the official hotels set up in the official tournament housing block. All reservations must be made through the designated reservation portal and must appear on the official rooming list and final compliance report. Stay-to-Play means that all teams that are attending a specific event are required to stay in a partner hotel.[10]

---

[5] *Id.*
[6] Frankel, *supra* note 3.
[7] Soloman, *supra* note 4.
[8] Aspen Institute, *Participation Trends*, https://projectplay.org/state-of-play-2025/participation-trends#5 (last visited Feb. 25, 2026).
[9] Soloman, *supra* note 4.
[10] Sarah Wise, *What You Should Know About Stay-To-Play*, Team Travel Source (September 15, 2022), https://www.teamtravelsource.com/2022/09/15/what-you-should-know-about-stp (last

26. TTS partners with tournament directors and event coordinators that designate TTS's platform as the exclusive reservation portal for numerous Stay-to-Play events across the country. TTS claims to be "the leader in tournament housing for youth sports."[11]

27. TTS informs parents that affiliated tournaments and events have a Stay-to-Play policy and that TTS is the official housing provider. Thus, TTS tells parents in no uncertain terms that, for their child to participate in a Stay-to-Play tournament or event, they are required to stay in particular hotels and to make their hotel reservations through TTS.[12]

28. According to its website as of February 2026, "Team Travel Source focuses on driving revenue growth and maximizing return on investment for event organizers, offering strategic solutions to boost profitability and financial success."[13]

29. TTS's website stated in April 2026 that its "results" include "1.4M+ Room nights booked per year."[14] Figure 1 below is a screenshot of one of TTS's webpages as of April 23, 2026.

---

visited Feb. 25, 2026).

[11] Team Travel Source, *Home Page*, https://www.teamtravelsource.com (last visited Apr. 23, 2026).

[12] Wise, *supra* note 10.

[13] Team Travel Source, *The TTS Difference*, https://www.teamtravelsource.com/the_tts_difference (last visited Feb. 25, 2026).

[14] Team Travel Source, *Event Housing*, https://www.teamtravelsource.com/event-housing (last visited Apr. 23, 2026).




Fig. 1.

30. TTS partners with major hotel chains and claims, and its website stated:

• Our Executives Sit On 5 Hotel Brand Advisory Boards

• 2021-2024 Hilton Largest Sports Intermediary by Revenue

• 2023 & 2024 Marriott Largest Sports Intermediary

• 1st or 2nd Highest Volume With All Hotel Brands[15]

31. According to its website as of February 2026, TTS supports more than 1,600 yearly events in more than 400 cities in 44 states, resulting in 900,000 Actualized Annual Room Nights.[16]

32. Tournament directors and event producers benefit from their partnership with TTS because TTS provides "rebates" to tournament directors. As shown in Figure 1, TTS claimed to have paid over $17 million in rebates in 2025.[17] On information and belief, these rebates are funded by the inflated hotel costs and junk fees paid by parents who TTS coerced into complying with Stay-to-Play policies and making hotel reservations via the TTS platform.

---

[15] Team Travel Source, *Events We Serve*, https://www.teamtravelsource.com/who_we_serve/events_we_support (last visited Feb. 25, 2026).

[16] *Id.*

[17] Team Travel Source, *supra* note 14.

33. TTS also benefits from partnering with tournament directors and event producers because TTS gains access to a captive market of parents of tournament and event participants.

34. Parents of tournament and event participants, on the other hand, do not benefit from Stay-to-Play policies. Profit-seeking entities that operate in the Stay-to-Play ecosystem, including TTS, are driving up costs for parents and limiting access by pricing out many young athletes.[18] Compelling families to stay in particular hotels, book hotel reservations through a specific platform, and pay junk fees for those reservations constitute "vulture practices" that are the subject of the Let Kids Play Act.[19]

35. Parents of youth athletes participating in TTS-affiliated events are generally directed to TTS's platform by their child's team manager, coach, or other club official.

36. For example, many parents of players on teams that registered for the EDP Spring Classic soccer tournament in New Jersey and Pennsylvania in March 2026 received a hyperlink via email that directed them to a TTS webpage that stated that TTS is the "official housing partner for EDP Soccer" and that the EDP event has a "mandatory housing requirement" and requires all bookings to be made through TTS's platform.

37. Figure 2 below shows what TTS told many parents of athletes participating in the EDP Spring Classic soccer tournament on March 13-14, 2026, via its website after they clicked on

---

[18] Jamal Walker, *As cost of youth sports grows, Congress eyes regulation of private equity*, Cronkite News (July 22, 2026), https://cronkitenews.azpbs.org/2026/07/22/youth-sports-private-equity/ (last visited July 23, 2026.

[19] S. 4522, 119th Cong. § 2 (2026). The Let Kids Play Act was introduced on May 13, 2026, by Senator Chris Murphy (D-Connecticut) and Representative Chris Deluzio (D-Pennsylvania) to combat (a) private equity firms' involvement in youth sports, and (b) vulture practices, "such as requiring that families stay at specific hotels for kids sports tournaments[.]" Stephen Borelli, *Bill seeks to end 'vulture practices' in kids sports: What it means*, USA Today (May 13, 2026), https://www.usatoday.com/story/sports/2026/05/13/let-kids-play-act-vulture-practices-youth-sports-explainer/90069811007/ (last visited July 22, 2026).

the TTS link that they received from their team manager or club official. Figure 2 was captured on January 30, 2026.




Fig. 2.

38. As shown in Figure 2, during this initial phase of the reservation process, TTS tells parents in bolded font that they must reserve hotel rooms through TTS's website before directing them through the multi-step booking flow.

39. Although TTS claims that parents will receive "discounted, locked-in hotel rates" from booking via TTS's platform, that claim is untrue. In reality, parents receive no such benefits from booking via TTS.

**C. Team Travel Source Charges Junk Fees During Its Online Booking Process.**

40. Though it claims to prioritize transparency,[20] TTS deceptively masks junk fees that it charges to parents who book hotel rooms through its website.

41. As shown in Figure 2, the TTS booking process begins by asking parents to select the dates of their stay and the number of guests and rooms. The next steps in the flow require them to select their hotel and room type from a menu. After making these selections, they are shown more detailed information, including check-in and check-out times, amenities, hotel cancellation policies, and a warning that additional incidental fees may be charged by the hotel. The base price per night and the total price are also displayed on this page with a fine print note that the total price "includes taxes & fees."

42. Figure 3 below is one example of what many parents of athletes participating in the EDP Spring Classic soccer tournament on March 13-14, 2026 saw on TTS's platform regarding the price of the hotel room during the booking process. Figure 3 was captured on January 30, 2026.

[20] Team Travel Source, *supra* note 13.




Fig. 3.

43. Parents who happen to click on the "Price Details" link on TTS's website under the total price are shown a pop-up that provides a breakdown of the charges as the base price of the room, a "Secondary Fee," and "Taxes." TTS vaguely refers to its junk fees as a "Secondary Fee" at this stage of the booking flow.

44. Figure 4 below is one example of what some parents of athletes participating in the EDP Spring Classic soccer tournament on March 13-14, 2026, saw if they clicked on "Price Details." Figure 4 was captured on January 30, 2026.




Fig. 4.

45. Parents who click "Reserve Room" are then directed to a TTS page that requests guest information and displays a "Reservation Summary" with a list of charges, including "Booking Service Fees."

46. Figure 5 below is one example of what a parent who booked a room at Aloft Hotel Mount Laurel in New Jersey via TTS's platform saw while booking a room in connection with the 2026 EDP Spring Classic. Figure 5 was captured on January 30, 2026.




Fig. 5.

47. On information and belief, the "Booking Service Fees" displayed in Figure 5 refer to the same fee as the "Secondary Fee" displayed in Figure 4.

48. Other parents who booked hotel rooms via Team Travel Source's platform reported being charged mandatory "Cancel Convenience," "Premier Property," and/or "Housing" fees in addition to a "Booking" fee.

49. Parents who booked hotel rooms via Team Travel Source's platform were charged mandatory "Booking," "Booking Service," "Premier Property," "Cancel Convenience," and/or "Housing" fees even when they were waitlisted for the hotel rooms they reserved.

50. After entering guest information, parents are then offered optional "Housing Protection" for an additional fee and asked for payment information. Some parents opted to pay a "Housing Protection" fee to TTS, which they paid in addition to the mandatory, unavoidable junk fees imposed by TTS.

51. After inputting payment information, parents are shown TTS's "Reservation

Policies," which include a description of the mandatory fees. At this point, parents have navigated through multiple steps in the booking process and have invested significant time inputting information, including room types; check in and check out dates; the number of guests; hotel guest names; guest type; players' team name, birth years, and genders; primary guest's mobile phone number; any special requests; hotel rewards information; whether they would like the "Housing Protection" option, which TTS claims provides a refundable booking for those who cannot attend and can provide evidence that they cannot attend for particular reasons; billing contact information; and credit card information. Only after investing the time to provide all of this information do parents see the "Reservation Policies" related to their bookings.

52. Figure 6 below is an example of what a parent who booked a room at Aloft Hotel Mount Laurel in New Jersey via TTS's platform saw as the "Reservation Policies" while booking a room for the 2026 EDP Spring Classic. Figure 6 was captured on January 30, 2026.




Fig. 6.

53. The "housing fee" is not explained during the booking flow. TTS also fails to

explain why the "booking fee" and the "housing fee" are charged on a per night basis during the booking flow.

54. A parent seeking to understand why he or she was being forced to pay a non-refundable "housing fee" for a hotel reservation by searching the TTS website would see that there is no legitimate basis for the fee. TTS provides the following vague non-answer to "What is a housing service fee?" in the "Booking Fee FAQs" section of its website: "This fee helps support various aspects of the overall event ensuring a seamless housing experience – both on and off the playing field!"[21] As discussed in greater detail below, Plaintiff Aleisha Kelley paid a "housing fee" to TTS but did not experience any benefit as a result of paying that fee.

55. TTS claims that the "Cancel Convenience" fee is a mandatory and non-refundable fee that generally enables parents to cancel their reservations without penalty up to 72 hours prior to arrival.[22] As discussed in greater detail below, Plaintiffs Michelle Heinz, Harmony Martin, Ashley Cali, Jennifer Costello, Aleisha Kelley, Stacie Isaacs, and Nicole Ledvina all paid "Cancel Convenience" fees to TTS but did not experience any benefit as a result of paying that fee.

56. For events that apply the "Cancel Convenience" fee, TTS does not give parents an option to avoid the fee and be subject to the hotel's standard cancellation policy, which in some cases is more favorable than TTS's 72-hour policy. For example:

a. Best Western and Drury Hotels typically allow free cancellation up to 24 hours prior to scheduled arrival;[23]

---

[21] Team Travel Source, *Booking Fee FAQS*, https://www.teamtravelsource.com/resources/faqs-booking-fees (last visited Apr. 23, 2026).
[22] Team Travel Source, *Cancel Convenience*, https://www.teamtravelsource.com/cancel-convenience-sport/ (last visited May 12, 2026).
[23] Engine Marketing, *Hotel Chains With the Most Flexible Hotel Cancellation Policies for Business Travelers*, Engine (Dec. 11, 2025), https://engine.com/blog/business-travel-flexible-hotel-cancellation-policies (last visited July 25, 2026).

b. Red Roof Inn, Motel 6, and Extended Stay America often offer day-of-arrival cancellations;[24]

c. Most Marriott reservations can be canceled 48 to 72 hours in advance;[25] and

d. Hyatt's standard policy requires cancellation 48 hours before check-in time, and elite members are eligible for a 24-hour cancellation policy.[26]

57. Plaintiffs and other parents who paid a "Cancel Convenience" fee to TTS did not receive any benefit in return. Had TTS not misrepresented to them that there was a mandatory housing requirement and that they were required to make reservations via TTS in order for their children to participate in Stay-to-Play events, they could have made alternate lodging arrangements with comparable or more favorable cancellation policies, such as at any of the hotel brands referenced in the preceding paragraph.

58. TTS even admits that it does not offer anything more than the regular hotel cancellation policy by describing the "Cancel Convenience" fee as follows on many reservation summaries that impose that fee: "All reservations equipped with TTS Cancel Convenience are eligible for free cancellation up until the hotel cancel policy."

59. All of the mandatory fees imposed by TTS constitute junk fees because they are unavoidable and offer little or nothing in return. These junk fees are concealed insofar as TTS deceptively refers to the fees as a "Secondary Fee" (as shown in Figure 4) and does not reveal the true nature of the fees until late in the booking process. TTS's practice of misrepresenting the junk

[24] *Id.*
[25] Jarrod West, *How to Cancel a Marriott Hotel Reservation*, Upgraded Points (Sep. 9, 2024), https://upgradedpoints.com/travel/hotels/how-to-cancel-a-marriott-hotel-reservation/ (last visited July 25, 2026).
[26] Ben Schlappig, *Hyatt's Special Cancelation Policy for Globalists & Explorists: A Forgotten Perk*, One Mile At a Time (Mar. 3, 2026), https://onemileatatime.com/insights/hyatt-cancelation-policy-globalist-explorist (last visited July 25, 2026).

fees it imposes violates the Federal Trade Commission's Rule on Unfair or Deceptive Fees, which "specifies that it is an unfair and deceptive practice for businesses to misrepresent any fee or charge in any offer, display, or advertisement for live-event tickets or short-term lodging."[27]

60. TTS also conceals other junk fees imposed by its hotel partners. For example and as detailed below, Plaintiffs Stacie Isaacs and Diana Ferrara were charged mandatory "resort fees" ranging from $25.00 to $28.00, which were imposed on a daily basis by the Gaylord Opryland Resort & Convention Center. TTS failed to adequately disclose the resort fee and failed to display the true total cost of the hotel reservation in the reservation summaries. As a result, Stacie Isaacs and Diana Ferrara paid significantly more than the "Total due" amount listed on the reservation summaries for these bookings when they settled their bills with the Gaylord Opryland Resort & Convention Center.

**D. Team Travel Source Falsely Advertises and Deceives Consumers.**

61. TTS misrepresents its policies to consumers by falsely telling parents that: (a) there is a mandatory housing requirement and they must book a room in an affiliated hotel via TTS's platform; (b) one of the benefits of a Stay-to-Play policy is to show the economic impact of a youth sporting event on a host city; and (c) parents save money by booking hotel stays via TTS's platform. As detailed in this First Amended Complaint, all of these statements are untrue.

62. TTS partners with tournament directors and event coordinators who enforce the Stay-to-Play policy to maximize profits for TTS and rebates for themselves.

63. These partners threaten to exclude teams from events if players' parents do not abide by the Stay-to-Play policy.

64. For example, EDP Soccer's website states: "Failure to comply with this [Stay-to-

---

[27] 16 C.F.R. pt. 464.3 (2025).

Play] requirement may lead to revocation of a team's acceptance in the tournament."[28]

65. In reality, not every athlete must comply with the Stay-to-Play mandate to participate in the tournaments and events affiliated with TTS. Generally, the tournaments and events either have a threshold requirement or quota, meaning a certain percentage of athletes must comply with the Stay-to-Play policy, or do not enforce the policy at all.

66. Despite the fact that tournaments and events do not require 100% compliance with Stay-to-Play, TTS reinforces the threats of its partners by explicitly telling ***all parents*** of registered participants who click on the TTS link from their team manager or club official that (a) there is a mandatory housing requirement, and (b) hotel rooms must be booked via TTS. TTS makes these representations during the initial stage of the booking flow. Notably, TTS fails to disclose any threshold compliance requirements or exceptions in the booking flow, leading reasonable consumers to believe that they have no choice but to make reservations via TTS and submit to TTS's unfair practice of tacking junk fees onto those reservations.

67. As shown in Figure 2, for example, TTS tells parents in bold during the initial step of the booking process on TTS's platform: "**This event has a mandatory housing requirement and requires all bookings to be made through this site**."

68. Any parent seeking clarification of the Stay-to-Play policy by visiting TTS's website would be left with the same understanding. TTS explains in a blog post on its website:

> In order to participate in the tournament or event, teams and athletes must stay in one of the official hotels set up in the official tournament housing block. All reservations must be made through the designated reservation portal and must appear on the official rooming list and final compliance report. Stay-to-Play means that all teams that are attending a specific event are required to stay in a partner hotel.[29]

---

[28] EDP Soccer, *Stay-to-Play Policy*, https://www.edpsoccer.com/policies/stay-to-play-policy (last visited Apr. 22, 2026).
[29] Wise, *supra* note 10.

69. TTS does not list any exceptions to the Stay-to-Play requirement in its "Stay-to-Play & Housing Requirement FAQs" on its website.[30]

70. TTS's "Stay-to-Play & Housing Requirement FAQs" also states: "Any reservation made outside of the designated booking site will NOT satisfy the Stay-to-Play requirement."[31]

71. TTS's representations that all teams and athletes must stay in participating hotels and book their hotel reservations via TTS are false because not every player on a team must stay in a hotel room or book their stay via TTS's platform in order for the team to participate in Stay-to-Play events. Plaintiff Kate Russell is aware of an athlete who was permitted to participate in the Southeast Qualifier Invitational in February 2026 even though her parents did not reserve a hotel room via TTS. Similarly, Plaintiff Michelle Heinz learned at some point in late 2024 or early 2025 that TTS's representation that every athlete must stay in an affiliated hotel booked via TTS's platform was false. Since then, Plaintiff Michelle Heinz has achieved significant savings on hotel stays when she has traveled with her child to cheer competitions.

72. TTS intentionally omits information regarding the threshold number of rooms that must be booked per team to deceive parents into believing that every athlete must stay in a TTS-affiliated hotel booked via TTS's platform so that TTS can increase (a) mandatory fees that benefit TTS, (b) revenues for TTS's hotel partners, and (c) rebates for TTS's event partners.

73. TTS's practice of telling consumers that they are required to book hotel stays via TTS's platform had the effect of restraining competition for short-term lodging near affiliated Stay-to-Play events during and around the event dates. On information and belief, hotels affiliated

---

[30] Team Travel Source, *Stay-to-Play & Housing Requirement FAQs*, https://www.teamtravelsource.com/resources/faqs-stay-to-play-housing-requirements (last visited Apr. 23, 2026).

[31] *Id.*

with TTS were able to charge higher prices to consumers booking via TTS's platform and did in fact charge higher prices because consumers believed TTS's representation that every athlete must stay in a hotel booked via TTS's platform in order for their children to participate in the event. Had TTS not engaged in this unfair and deceptive practice, families could have explored alternate lodging options, such as staying with family or friends, camping or renting an RV, renting a home or apartment via Airbnb or Vrbo, or staying in a hostel, motel, or bed and breakfast.

74. TTS also deceives consumers by falsely claiming that one of the benefits of a Stay-to-Play policy is to show the economic impact of a youth sporting event on a city. TTS tells consumers on the "STAY-TO-PLAY & HOUSING REQUIREMENT FAQs" portion of its website:

> Housing requirements serve two main purposes. First, it helps event organizers secure the best possible event dates and venues. Cities measure the economic impact of events based on hotel room usage—convention centers are built to attract business, and hotel room nights are a key metric. When an event can demonstrate its value by showing that participants are staying in partner hotels, the city is more likely to support the event with favorable dates, rates, and future opportunities. This applies to both large city-wide events and smaller regional ones.
>
> Second, housing requirements protect customers. By consolidating bookings, housing partners can negotiate lower rates and ensure those rates remain stable, regardless of market demand. These agreements also help secure better amenities, more flexible cancellation policies, and access to high-quality hotels near the event venue.[32]

75. In reality, however, many of the hotels offered by TTS are located far away from the event venues, and hotel rooms booked many miles from the events have little to no economic impact on the host city.

76. For example, Aloft Hotel Mount Laurel in New Jersey is located in Mount Laurel

[32] *Id.*

Township, New Jersey, which is 27 miles away from the nearest field used as part of the 2026 EDP Spring Classic in Hammonton, New Jersey. Some of the 2026 EDP Spring Classic games were played 70 miles away from Aloft Hotel Mount Laurel in Oceanport, New Jersey, while others were played in Chester, Pennsylvania and Pittsgrove, New Jersey[33]—30 and 39 miles away from Aloft Hotel Mount Laurel, respectively. On information and belief, hotel stays in Mount Laurel Township had no economic impact on the four municipalities that hosted the 2026 EDP Spring Classic.

77. As discussed in greater detail below, Plaintiffs Kate Russell, Harmony Martin, Aleisha Kelley, and Stacie Isaacs were among the parents who booked hotel rooms via TTS that were not located near the event venues.

78. TTS further deceives consumers by claiming that parents save money by booking hotel stays via TTS's platform as opposed to reserving lodging of their choice directly with the hotel or via another third-party booking platform. Specifically, TTS falsely tells consumers on the "STAY-TO-PLAY & HOUSING REQUIREMENT FAQs" portion of its website: "Housing requirements at events will…• Lock in the lowest hotel rates at the premier properties[.]"[34] As shown in Figure 2, TTS also tells parents that they will benefit from "discounted, locked in hotel rates" by booking through TTS during the initial part of the booking process. Reasonable consumers understand these representations to mean they will achieve savings by reserving lodging through TTS, but they do not in fact save money due to the inflated hotel prices and mandatory junk fees that TTS adds.

79. The TTS website also states that TTS provides a "Lowest Rate Guarantee."[35] But

---

[33] EDP Soccer, *Home Page*, https://www.edpsoccer.com/spring-classic (last visited Apr. 23, 2026).

[34] Team Travel Source, *supra* note 30.

[35] Team Travel Source, *Lowest Rate Guarantee*, https://www.teamtravelsource.com/lowest-rate-

this guarantee only applies to "some events" and does not factor in the mandatory junk fees that consumers must pay when they book via TTS's platform.[36]

80. Additionally, "[r]ates found on sites such as Expedia, Travelocity, Hotels.com, Priceline, etc.," "Memberships Rates such as AAA and AARP, etc.," and other rates are excluded from the "Lowest Rate Guarantee."[37]

81. Because TTS excludes the junk fees from the calculation and excludes rates available on other third-party booking platforms and membership rates, TTS's "Lowest Rate Guarantee" is illusory and TTS's representations regarding the "guarantee" are misleading.

82. Parents are often able to find the same room types at the same hotels on the same nights at lower rates.

83. For example, parents who booked rooms at Aloft Hotel Mount Laurel in New Jersey via TTS's platform in connection with the 2026 EDP Spring Classic paid more than they would have had they become Marriott Bonvoy members and reserved a "Member Flexible Rate" room through the Marriott Bonvoy website. Figure 7 below shows the rate that was available to Marriott Bonvoy members for the same flexible room type shown in Figure 6 above. Figure 7 was captured on January 30, 2026.

---

guarantee (last visited Apr. 23, 2026).

[36] *Id.* ("Any booking fees paid when making your reservation through TTS do not count towards the room rate or the Lowest Rate Guarantee.").

[37] *Id.*




Fig. 7.

84. A Marriott Bonvoy membership is free.[38]

85. Any parents who were willing to prepay for their rooms at Aloft Hotel Mount Laurel in New Jersey and give up their opportunity to make changes or seek a refund would have achieved even greater savings, as shown in Figure 8 below. Figure 8 was captured on January 30, 2026.

[38] Marriot Bonvoy, *Create Account Page*, https://www.marriott.com/loyalty/createAccount/createAccountPage1.mi (last visited Apr. 29, 2026).




Fig. 8.

86. As discussed *infra*, several consumers reported that when they attempted to take advantage of TTS's "Lowest Rate Guarantee," TTS did not lower its rates to match other rates.

87. In some cases, TTS induced hotels to match TTS's quoted rates by ***raising*** prices offered elsewhere. In those situations, TTS's "Lowest Rate Guarantee" effectively operated as a rate floor as opposed to a rate ceiling.

88. In other cases, TTS refused to honor its "Lowest Rate Guarantee" even though consumers found lower, non-member rates on the same dates directly through the hotel. For example, and as detailed below, in November 2025, Plaintiff Aleisha Kelley notified TTS of a lower, non-member rate available at the same Holiday Inn Express and Suites in Kansas City on the same dates as her April 2026 reservation via TTS, and TTS refused to adjust her rate to match the rate she found directly through the hotel's website.

89. No reasonable consumer would interpret TTS's "Lowest Rate Guarantee" as a guarantee that their price would be matched via a price increase for others rather than a price reduction for consumers who booked via TTS's platform. To the contrary, reasonable consumers expect that TTS would honor its advertised "Lowest Rate Guarantee" by matching lower rates offered directly by the hotel.

**E. Thousands of Parents Have Been Harmed by Team Travel Source's Practices.**

90. According to the TTS website, more than 1.4 million room nights are booked per year via TTS's platform.[39] Because TTS's mandatory, non-refundable junk fees are applied to every reservation—and in many cases on a per night per room basis—on information and belief TTS collects millions of dollars from consumers each year by charging these junk fees.

91. Tens of thousands, if not millions, of parents each year are harmed by TTS's deceptive, unfair, and unconscionable practices. Consumer victims are parents of athletes who participate in a variety of sports.

92. TTS is the "official housing provider" of EDP Soccer, and EDP Soccer tournaments are Stay-to-Play events.[40] According to EDP Soccer, more than 5,000 teams compete in EDP tournaments annually.[41] EDP tournament games use 7v7, 9v9, or 11v11 game formats depending on the age of the teams with maximum roster sizes ranging from 14 to 18 players, respectively,[42] meaning that 5,000 teams likely consists of well over 50,000 athletes participating in EDP

---

[39] Team Travel Source, *supra* note 14; Fig. 1, *supra*.
[40] EDP Soccer, *supra* note 28.
[41] EDP Soccer, *About Page*, https://www.edpsoccer.com/about#:~:text=More%20than%208%2C500%20teams%20participate%20in%20EDP's,5%2C000%20teams%20compete%20in%20EDP%20tournaments%20annually.&text=participants%20each%20year%20across%20seven%20sports (last visited Apr. 23, 2026).
[42] EDP Soccer, *Laws Of The Game*, https://www.edpsoccer.com/policies/laws-of-the-game (last visited Apr. 23, 2026).

tournaments each year.

93. TTS is the "official travel partner" of 3STEP Sports ("3STEP").[43] According to 3STEP's website, 3STEP is a youth sports organization that hosts events for basketball, combat, field hockey, football, lacrosse, soccer, and volleyball and has more than 2 million athlete participants.[44]

94. TTS also partners with USA Volleyball. The 2026 USA Volleyball Girls Junior National Championship 14-17 in Indianapolis, Indiana is a "Stay and Play event" and requires that all housing be booked via TTS's platform.[45] The 2026 USA Volleyball Girls Junior National Championship 11-13 in Minneapolis, Minnesota is also a "Stay and Play" event that requires booking through TTS.[46] According to USA Volleyball: "In June and July each year, more than 25,000 girls, ages 11-17, compete at the USA Volleyball Girls Junior National Championship 10-13s and USA Volleyball Girls Junior National Championship 14-17s."[47]

95. TTS partners with other sports organizations that host Stay-to-Play events, including but not limited to Varsity Spirit (cheer and dance),[48] USA Field Hockey,[49] USA Judo,[50]

---

[43] 3STEP Sports, *Team Travel Source*, https://threestep.com/team-travel-source (last visited Apr. 23, 2026).
[44] 3STEP Sports, *Sports*, https://threestep.com/sports (last visited Apr. 23, 2026).
[45] USA Volleyball, *2026 USA Volleyball Girls Junior National Championship 14-17 presented by Credit Union 1*, https://usavolleyball.org/event/2026-usa-volleyball-girls-junior-national-championship-14-17 (last visited Apr. 23, 2026).
[46] Sports Engine, *2026 USAV Girls Junior National Championship 11-13*, https://www.advancedeventsystems.com/41958 (last visited Apr. 23, 2026).
[47] USA Volleyball, *Girls Indoor*, https://usavolleyball.org/compete/girls-indoor (last visited Apr. 23, 2026).
[48] Varsity Spirit, *Stay Smart Overview*, https://www.varsity.com/home/stay-smart (last visited Apr. 23, 2026).
[49] Event Pipe, *2026 – Sunshine Showcase*, https:///app.eventpipe.com/event/d96cffaf-748b-4f05-b699-866eea5e8da9/inactive (last visited Apr. 23, 2026).
[50] USA Judo, *2025 USA Judo Youth National Championships*, https://www.usajudo.com/2025-usa-judo-youth-national-championships (last visited Apr. 23, 2026).

Aloha Tournaments (lacrosse),[51] and the Lancaster Archery Classic.[52]

96. The overwhelming majority of parents who reserved hotel rooms via TTS's platform would not have done so had TTS not misrepresented that parents were required to reserve rooms via TTS's platform in order for their children to participate in TTS-affiliated events.

97. The overwhelming majority of parents who paid junk fees when they reserved hotel rooms via TTS's platform would not have done so had TTS not:

a. misrepresented that parents were required to reserve rooms via TTS's platform in order for their children to participate in TTS-affiliated events;

b. misrepresented the nature of the fees it charged;

c. misrepresented that parents benefit from a Stay-to-Play policy; and

d. falsely advertised a "Lowest Rate Guarantee."

98. Parents who reserved hotel rooms via TTS's platform were harmed insofar as they (a) paid mandatory junk fees for every hotel stay they reserved via TTS's platform and (b) paid more to stay at TTS-affiliated hotels than they would have had they reserved a hotel room or alternate accommodations without using TTS's platform.

99. Parents, including Plaintiffs and members of the Classes, will continue to be harmed by TTS if TTS does not halt its unlawful practices.

**F. Numerous Parents Have Complained About Team Travel Source's Practices.**

100. Parents have shared their frustrations about TTS's unfair, deceptive, and unconscionable practices by filing complaints with the Better Business Bureau and leaving negative reviews on the Better Business Bureau website and on other online review sites. As of

---

[51] Aloha Lacrosse, *Hotel Information*, https://www.alohatournaments.com/page/hotels (last visited Apr. 23, 2026).

[52] Event Pipe, *2027 Lancaster Archery Classic*, https://presto.eventpipe.com/event/e65bba83-9b30-45ad-9d79-564fdd86bd09 (last visited Apr. 23, 2026).

April 23, 2026, there were 17 consumer reviews on the Better Business Bureau website, and those reviewers unanimously gave TTS a 1-star review out of 5 stars.

101. As one Better Business Bureau reviewer noted in January 2025:

> This whole industry including team travel source have been awful. Just a way for another company to collect even more money from the parents of travel athletes. Most of us know how to travel and book hotels. There is no added value and this company makes booking through their site mandatory. They give you fewer room and hotel options at higher prices than the hotels are offering. Unfortunately for the athletes and parents the use of team travel source is mandatory at many of these competitions. I assume the event organizers use them because they probably give kickbacks to the organizers, and the hotels probably kick back money to TTS for booking blocks of rooms. I would be happy if I was never forced to use this company again.[53]

102. Another Better Business Bureau reviewer wrote in May 2024:

> Horrible company. Volleyball tournament in July in Vegas. I have called the majority of hotels on the strip, including the hotel where the tournament is being housed, and all of them have PLENTY of rooms available. Working through team travel source the only block of rooms, 12 rooms mind you, is SIX miles away from the tournament venue. We are required to book through team travel source and it is beyond frustrating. It would be entirely possible to stay at the event venue, but because we have to go through this company we are incurring additional travel fees, having to stay at a less than desirable hotel, and many more headaches trying to support our 15 and 16 year-old girls.
>
> Horrible company that does not care about the families that are being impacted and where they stay. I would pay full price for a hotel to be where we need to be and this company can't even secure that.
>
> I would like to speak with an owner of the company to better understand their actual value to the rest of us.[54]

---

[53] Better Business Bureau, *Team Travel Source Reviews (Page 1)*, https://www.bbb.org/us/ky/louisville/profile/event-planner/team-travel-source-0402-159161279/customer-reviews?page=1&sort=reviewDate%20desc%2C%20id%20desc (last visited Apr. 23, 2026).

[54] Better Business Bureau, *Team Travel Source Reviews (Page 2)*, https://www.bbb.org/us/ky/louisville/profile/event-planner/team-travel-source-0402-159161279/customer-reviews?page=2&sort=reviewDate%20desc%2C%20id%20desc (last

103. Yet another Better Business Bureau reviewer wrote in January 2024:

> Rip off organization. Worthless "lowest price" guarantee. I wish I could leave them 0 stars.
>
> I showed them 4 lower hotel prices and they have so many loop holes it is impossible to get them to honor their "guarantee". The threat was that my grandson would not be able to play in his hockey tournament if we booked the hotel on our own. I cannot understand how this can be legal.
>
> I wonder how much they give in kick backs to tournament organizers?[55]

104. Another consumer noted that the "Lowest Rate Guarantee" was misleading in her January 2025 complaint to the Better Business Bureau:

> We are required to use this company to book hotel rooms for cheer competitions. Their website promises a "Lowest Rate Guarantee". It states, "In the event that you are able to find a lower rate than what Team Travel Source has offered, TTS does offer a Lowest Rate Guarantee. This must be an identical comparison. If you find a room of the same type, on the same dates, with the same included amenities and the same payment and cancellation terms, report it using the form below." I found a significantly lower rate that was identical in all things and submitted the form. Rather than honor the lowest rate guarantee, and adjusting my rate, they ask the hotel to either raise their published rate or lower the contracted rate with TTS. Of course the hotel chose to raise their rates. This is false advertising to say you guarantee the lowest rate but then instead of giving the customer the lower rate you get the hotel to raise their rates.[56]

105. A Google reviewer recounted a similar experience in his 1-star review of TTS in September 2025:

> This company does not take customer service seriously. Pricing in their website for hotels are abusive. They say they have a pricing

visited Apr. 23, 2026).

[55] *Id.*

[56] Better Business Bureau, *Team Travel Source (Complaints)*, https://www.bbb.org/us/ky/louisville/profile/event-planner/team-travel-source-0402-159161279/complaints (last visited Apr. 23, 2026).

> matching form (in case you find a better pricing in the same hotel "outside" their website). You fill it out, and look at the answer: "We are reaching out regarding your Lower Rate submission.
> The Four Points has decided to increase their rate online to $269 per night for both room types they are offering for the FL Volleyball Challenge, making our contracted rate the best standard rate available. We apologize for any inconvenience this may have caused. When a lower rate is submitted, we reach out to the hotel, and they will decide to either lower our contracted rate or raise the rate online to comply with the contract.
> If you have any questions, please let us know!"
>
> So, they not only matched the price, but mentioned that the hotel increased the rates. Which is a lie (proof below [referencing a screenshot showing a lower hotel room price], on the same date of the e-mail". I'm writing them again, because calling is not easy, they take hours to answer to a call. Very disappointed.[57]

106. Another, more recent Google reviewer also noted in his 1-star review of TTS that he could have saved hundreds of dollars by not booking via TTS's platform:

> Over charging to put money in their pocket. First I called and talked to someone who advised me to fill out a form online which I did, then Emailed them about rates on a hotel before I left because it was $200 less if I booked myself. I haven't received a response and it's almost been a week now. Seems like they are just taking advantage of people I will be sure to let my soccer club know and other clubs not to use this company.[58]

107. Yet another Google reviewer expressed their shock that the "Lowest Rate Guarantee" effectively meant that a hotel would "match" the TTS rate by increasing its rates:

> This agency is a complete racket. You would think as a travel company they would be able to negotiate hotel rates below the highest rack rate available to actually have a value add to the end customer - but no, that is how they get their kickbacks and make $$. The low rate guarantee is an complete bogus offering. We found we

---

[57] Google, *Team Travel Source Reviews*, https://www.google.com/maps/place/Team+Travel+Source/@38.2409618,-85.5156371,17z/data=!3m1!5s0x886998adefb3cd95:0xf99e0aa38b0aa906!4m8!3m7!1s0x886998adefc7a5cd:0x3e85147f7da179ad!8m2!3d38.2409618!4d-85.5156371!9m1!1b1!16s%2Fg%2F11h9tq_3_h?entry=ttu&g_ep=EgoyMDI2MDQyMS4wIKXMDSoASAFQAw%3D%3D (last visited Apr. 23, 2026).

[58] *Id.*

> were ably to book via hotel website (and this was 5 weeks in advance) a rate of $120 per night vs the forced 159 per night from TTS. After multiple back and forth with the low rate guarantee agent, I was able to show them a 100% apples to apples rate of 141 vs their 159. What happened next just astonished me! They called the hotel and made them aware of the rate in question, and the hotel immediately RAISED THIER WEBSITE RATE TO $159 !!! Not making this up! I have email proof of what they did. This is not how a business should operate to 'help' families that pay $$$ for tournament travel as it is and then really stick it to them on the forced pay to play tournaments.[59]

108. The general consensus among parents is that Stay-to-Play policies do not benefit them, as expressed in this Google review of TTS:

> The partnership with Varsity forces families of athletes to stay in hotels that are often above the market rate, and for stays that are longer than necessary for shorter competitions. And that's IF you can get a hotel booked through the booking link as they are frequently already sold out even when trying to book immediately after the link is released. Cancellation policies also gouge families for the inability to cancel which doesn't allow for last minutes changes or emergencies. Then there are the fees…booking fees, cancellation fees, insurance fees- would have none of that booking directly with the hotel. It was so much easier before these booking companies when coaches and teams could work directly with the hotels to reserve a block of rooms so that all teammates could stay together at the same place. Stay and play is the worst thing ever for organized competitive sports!![60]

### G. Team Travel Source Knowingly and Willfully Deceives Consumers, Falsely Advertises to Them, and Otherwise Acts with Malice, Oppression, and Fraud.

109. As detailed herein, TTS knowingly and willfully deceives consumers, falsely advertises to them, and otherwise acts with malice, oppression, and fraud.

110. TTS knowingly and willfully deceived consumers, including Plaintiffs and the Classes (as defined below), because, among other reasons and as otherwise detailed in this First Amended Complaint, TTS knowingly and willfully misrepresented the nature of the mandatory

---

[59] *Id.*
[60] *Id.*

fees, falsely told consumers that they were required to book hotel stays via TTS's platform in order for their children to participate in affiliated events, misrepresented the reason for the Stay-to-Play policy, and falsely claimed that consumers benefit from a Stay-to-Play policy. TTS made these representations despite knowing the true nature of the junk fees, that not every player on a team was required to stay in a hotel room booked via TTS's platform to participate in the event, that the true reason for the Stay-to-Play policy is to generate revenues for TTS and its event and hotel partners, and that consumers do not benefit from a Stay-to-Play policy. TTS continues to engage in these deceptive practices.

111. TTS knowingly and willfully engaged and continues to engage in false advertising, because, among other reasons and as otherwise detailed in this First Amended Complaint, TTS knowingly and willfully advertises to consumers, including Plaintiffs and the Classes, that they would save money by booking hotel stays via TTS's platform and by offering a "Lowest Rate Guarantee" that did not in fact guarantee the lowest rate on hotel stays.

112. TTS has acted with malice because, among other reasons and as otherwise detailed in this First Amended Complaint, TTS's conduct was despicable and done with a willful and knowing disregard of the rights of the public, Plaintiffs, and the members of the Classes because TTS knew (or should have known) that their mandatory junk fee charges were illegal, but despite that induced Plaintiffs and members of the Classes to pay the illegal charges anyway.

113. TTS's conduct was oppressive because, among other reasons and as otherwise detailed in this First Amended Complaint, it was despicable and subjected Plaintiffs and members of the Classes to cruel and unjust hardship in knowing disregard of their rights, including by falsely charging them mandatory junk fees, which were falsely held out to be a "Secondary Fee," by falsely telling them that they had no choice but to book hotel stays via TTS's platform if they

wanted their children to be able to participate in Stay-to-Play events, and by falsely telling them that they were guaranteed the lowest rate.

114. TTS's conduct was fraudulent because, among other reasons and as otherwise detailed in this First Amended Complaint, TTS (a) intentionally misrepresented and concealed the true nature of its mandatory junk fee charges from Plaintiffs and the Classes by affirmatively representing the fees as a "Secondary Fee" and falsely claiming that the junk fees benefit consumers, (b) falsely told Plaintiffs and the Classes that they must book hotel stays via TTS's platform in order for their children to participate in affiliated events, (c) misrepresented the reason for the Stay-to-Play policy to Plaintiffs and the Classes, (d) falsely told Plaintiffs and the Classes that they benefited from Stay-to-Play policies, including by stating they would "lock in the lowest hotel rates[,]" and (e) advertised a "Lowest Rate Guarantee" that did not in fact guarantee the lowest rate on hotel stays.

## NAMED PLAINTIFFS' ALLEGATIONS

*Plaintiff Kate Russell*

115. Kate Russell is a resident of Kentucky and the mother of a volleyball player.

116. Kate Russell was informed by her child's volleyball club that the team would not be allowed to participate in certain volleyball tournaments if she did not book a hotel room via TTS because the events were "Stay-to-Play" events. One of the "Stay-to-Play" events was the 2026 Southeast Qualifier Invitational volleyball tournament in Atlanta, Georgia.

117. On October 6, 2025, Kate Russell received an email from her child's volleyball club director that included a hyperlink to a TTS website and instructed her to make a hotel reservation in connection with the 2026 Southeast Qualifier Invitational.

118. On October 7, 2025, Kate Russell made a 3-night hotel reservation at the Sonesta

Atlanta Airport North via TTS so that her daughter could compete in the Southeast Qualifier Invitational in February 2026. She made this reservation while she was in her home state of Kentucky.

119. On or around October 7, 2025, TTS stated to Kate Russell during the first part of the booking flow process on TTS's platform that the Southeast Qualifier Invitational had a Stay-to-Play policy and that she was required to make a hotel reservation via TTS.

120. The TTS website link that Kate Russell received from the club director via email on October 6, 2025, is now labeled as "inactive" in the URL, but the current text of the page includes the following statement: "This event is Stay to Play and does require ALL bookings be made through this site."[61] The website includes TTS's name, website, contact information, and hours. A chatbox icon on the website opens a window that shows "Chat with Team Travel Source" at the top.

121. When Kate Russell made her reservation on October 7, 2025, she reserved three nights at the Sonesta Atlanta Airport North for a total of $516.85, which included mandatory "Booking Services Fees" fees charged on a per night basis at $5.00 per night even though she booked all three nights in one transaction. She paid the $15.00 "Booking Services Fees" directly to TTS when she made her reservation on October 7, 2025. She did not receive any benefit in exchange for the fees she paid to TTS.

122. Kate Russell understood that she was supposed to be getting the best deal possible by reserving a room through TTS because TTS's website contained statements regarding locking in discounted rates as well as a "Lowest Rate Guarantee."

---

[61] Event Pipe, *2026 – Southeast Qualifier Invitational (SEQ) – Week 2*, https://app.eventpipe.com/event/4bb2f208-e46e-415b-a7ce-7c6602285ac4/inactive (last visited July 25, 2026).

123. Kate Russell was told by her volleyball club that her team would be disqualified from the tournament if she did not reserve a room through TTS, and TTS reinforced this misrepresentation by telling her during the booking flow: "This event is Stay to Play and does require ALL bookings be made through this site." She would not have reserved a room via TTS's platform had TTS not told her during the booking flow that she was required to do so.

124. Kate Russell is aware that she did not receive the best deal possible by reserving a room via TTS's platform and that not all athletes needed to reserve rooms through TTS to participate in the Southeast Qualifier Invitational volleyball tournament because she has a friend who is a parent of a child on the same team who stayed at another hotel that was not booked via TTS. Her friend stayed at the Comfort Suites Morrow-Atlanta South for two nights and paid a total of $315.00 for her hotel room, and her friend's daughter was allowed to participate in the competition even though she did not book via TTS. Her friend was not charged the "Booking Services Fees" or any other reservation fee, and she paid less than Kate Russell did on a per night basis.

125. In addition to the TTS-affiliated hotel being more expensive than other options, the Sonesta Atlanta Airport North was not in a desirable location because it was close to the Atlanta airport. The commute from the Sonesta Atlanta Airport North to the convention center where the tournament was located was longer than 30 minutes with traffic.

126. Kate Russell would not have reserved a room via TTS had TTS not told her during the booking process that she was required to do so, and she would not have stayed at the Sonesta Atlanta Airport North for the Southeast Qualifier Invitational volleyball tournament. She would have found a more affordable option in a more desirable location.

127. Kate Russell's daughter still plays competitive volleyball, and Kate Russell is at

risk of suffering further harm by TTS if it continues engaging in the deceptive and unfair practices described herein.

*Plaintiff Michelle Heinz*

128. Michelle Heinz is a resident of Kentucky and the mother of a competitive cheerleader.

129. Michelle Heinz has booked hotel rooms via TTS and paid mandatory fees to TTS in connection with "Stay-to-Play" cheer competitions numerous times starting in 2018 because she was told by TTS and others that her daughter would not be able to compete if she did not reserve hotel rooms via TTS's platform. She made these reservations while she was in her home state of Kentucky.

130. The hotel reservations that Michelle Heinz made via TTS's platform in connection with cheer competitions include the following:

| Hotel Name | Competition Name | Reservation Date | Hotel Stay Dates |
|---|---|---|---|
| Drury Inn & Suites Indianapolis Northeast | 2021 - JAMfest Cheer Super Nationals | 10/28/2020 | 1/15/2021 - 1/17/2021 |
| Drury Inn & Suites Indianapolis Northeast | 2022 - JAMfest Cheer Super Nationals | 10/08/2021 | 1/14/2022 - 1/16/2022 |
| Hampton Inn and Suites by Hilton Indianapolis Airport* | 2022 - JAMfest Cheer Super Nationals | 10/04/2021 | 1/14/2022 - 1/16/2022 |
| Hampton Inn by Hilton Indianapolis/Fishers* | 2023 - JAMfest - Cheer Super Nationals | 10/13/2022 | 1/20/2023 - 1/22/2023 |
| Drury Plaza Hotel Indianapolis Carmel*^ | 2023 - JAMfest - Cheer Super Nationals | 10/12/2022 | 1/20/2023 - 1/22/2023 |
| Drury Plaza Hotel Indianapolis Carmel | 2023 - JAMfest - Cheer Super Nationals | 10/12/2022 | 1/20/2023 - 1/22/2023 |
| Drury Inn & Suites Grove City | 2023 - JAMfest - Cheer Super Nationals | 9/15/2022 | 2/24/2023 - 2/26/2023 |
| Drury Plaza Hotel Columbus Downtown*^ | 2023 - COA - Columbus - Grand Nationals | 9/15/2022 | 2/24/2023 - 2/26/2023 |
| Residence Inn by Marriott Columbus | 2023 - COA - Columbus - Grand Nationals | 9/15/2022 | 2/24/2023 - 2/26/2023 |

| | | | |
|---|---|---|---|
| Airport* | | | |
| Drury Inn & Suites Indianapolis Northeast | 2024 - JAMfest Cheer Super Nationals | 9/21/2023 | 1/12/2024 - 1/14/2024 |
| Candlewood Suites Indianapolis Downtown Medical District* | 2024 - JAMfest Cheer Super Nationals | 9/21/2023 | 1/12/2024 - 1/14/2024 |
| Drury Plaza Hotel Columbus Downtown | 2024 - COA - Grand Nationals | 9/8/2023 | 2/23/2024 - 2/25/2024 |
| Holiday Inn Express and Suites Columbus Expo Center* | 2024 - COA - Grand Nationals | 9/8/2023 | 2/23/2024 - 2/25/2024 |
| Drury Plaza Hotel Indianapolis Carmel | 2025 - JAMfest Cheer Super Nationals | 10/17/2024 | 1/17/2025 - 1/19/2025 |
| Hyatt Place Columbus OSU* | 2025 - Athletic Championships - Nationals & Dance Grand Nationals | 9/17/2024 | 1/24/2025 - 1/26/2025 |
| Holiday Inn Express and Suites Columbus Expo Center* | 2025 - Athletic Championships - Nationals & Dance Grand Nationals | 9/17/2024 | 1/24/2025 - 1/26/2025 |
| Drury Inn & Suites Grove City | 2025 - COA - Grand Nationals | 9/17/2024 | 2/21/2025 - 2/23/2025 |

131. When Michelle Heinz made hotel reservations on or about the dates listed in the chart in the preceding paragraph, she did so because TTS told her during the booking process on TTS's platform that there was a mandatory housing requirement.

132. In several instances noted in the chart above, Michelle Heinz reserved rooms at more than one hotel in connection with the same competition. She made more than one reservation for these events because she was either waitlisted at her preferred hotel from the TTS hotel menu or because the TTS menu was updated after she made her first reservation. In the chart above, hotels marked with an asterisk (*) indicate reservations that were canceled. Hotels marked with a caret (^) indicate reservations that were waitlist reservations.

133. When Michelle Heinz reserved waitlist and available rooms for the same competition, she did so because she was told by TTS and others that she needed to book a room

that was available, which meant that she had to pay the mandatory fees for both the waitlist room and the available room. When the waitlist room became available, she was also charged a cancellation fee to cancel the room that was originally available, which she never intended to stay in. She was led to believe by TTS that if her chosen waitlisted room did not become available and the other TTS-affiliated hotels were sold out, her daughter would not be permitted to compete. This happened to Michelle Heinz on more than one occasion.

134. Michelle Heinz paid mandatory "Booking" and "Cancel Convenience" fees to TTS in connection with her hotel reservations, including the fees paid on the following dates:

| Fee Payment Date | Name of Competition | Type of Fee | Total Amount of Fee |
|---|---|---|---|
| 10/28/2020 | 2021 - JAMfest Cheer Super Nationals | Booking<br>Cancel Convenience | $3.99<br>$6.00 |
| 10/08/2021 | 2022 - JAMfest Cheer Super Nationals | Booking<br>Cancel Convenience | $7.98**<br>$12.00** |
| 10/04/2021 | 2022 - JAMfest Cheer Super Nationals | Booking<br>Cancel Convenience | $3.99<br>$6.00 |
| 10/13/2022 | 2023 - JAMfest - Cheer Super Nationals | Booking<br>Cancel Convenience | $3.99<br>$6.00 |
| 10/12/2022 | 2023 - JAMfest - Cheer Super Nationals | Booking<br>Cancel Convenience | $3.99<br>$6.00 |
| 9/15/2022 | 2023 - JAMfest - Cheer Super Nationals | Booking<br>Cancel Convenience | $3.99<br>$6.00 |
| 9/15/2022 | 2023 - COA - Columbus - Grand Nationals | Booking<br>Cancel Convenience | $3.99<br>$6.00 |
| 9/21/2023 | 2024 - JAMfest Cheer Super Nationals | Booking<br>Cancel Convenience | $4.99<br>$7.00 |
| 9/21/2023 | 2024 - JAMfest Cheer Super Nationals | Booking<br>Cancel Convenience | $4.99<br>$7.00 |
| 9/8/2023 | 2024 - COA - Grand Nationals | Booking<br>Cancel Convenience | $4.99<br>$7.00 |
| 9/8/2023 | 2024 - COA - Grand Nationals | Booking<br>Cancel Convenience | $4.99<br>$7.00 |
| 10/17/2024 | 2025 - JAMfest Cheer Super Nationals | Booking<br>Cancel Convenience | $4.99<br>$7.00 |
| 9/17/2024 | 2025 - Athletic Championships - Nationals & Dance Grand Nationals | Booking<br>Cancel Convenience | $4.99<br>$7.00 |

135. Michelle Heinz received no benefit in exchange for any of the fees she paid to TTS. Had she reserved rooms directly through the same hotels or other hotels of her choosing, she would not have had to pay any of the fees listed above and would have received comparable rooms, better rates, and comparable or more favorable cancellation policies.

136. Michelle Heinz works in the travel industry and has access to special travel agent rates. She asked TTS for an exemption from the "Stay-to-Play" requirement because she had access to more favorable rates than she could get by reserving rooms via TTS, but TTS denied her request.

137. Michelle Heinz received no benefits in exchange for the mandatory "Booking" fees that she paid to TTS. She could have made reservations directly with hotels or via other third-party booking platforms and not incurred a "Booking" fee had TTS not told her that she was required to reserve a room via its platform.

138. Michelle Heinz did not receive any benefit in exchange for paying the "Cancel Convenience" fees to TTS. TTS even admits that it does not offer anything more than the regular hotel cancellation policy. For example, on the reservation summary in connection with the reservation Michelle Heinz made on October 13, 2022, TTS stated: "All reservations equipped with TTS Cancel Convenience are eligible for free cancellation up until 72 hours prior to arrival. ***If hotel cancellation policy is less than 72 hours, then the hotel cancellation policy will apply.***" (emphasis added.) Similarly, on reservation summaries in connection with reservations she made on September 15, 2022, and October 12, 2022, TTS stated: "All reservations equipped with TTS Cancel Convenience are eligible for free cancellation up until 24 hours prior to arrival. ***If hotel cancellation policy is less than 24 hours, then the hotel cancellation policy will apply.***" (emphasis added.) On a reservation summary in connection with another reservation she made on September

15, 2022, TTS stated: "All reservations equipped with TTS Cancel Convenience are eligible for free cancellation up until 48 hours prior to arrival. ***If hotel cancellation policy is less than 48 hours, then the hotel cancellation policy will apply.***" (emphasis added.) Thus, TTS admitted that it provided no benefit in exchange for the "Cancel Convenience" fee.

139. TTS charged Michelle Heinz double "Booking" and "Cancel Convenience" fees on October 8, 2021, because she reserved two rooms, and TTS applied the mandatory fees on a per room basis. These fees are noted in the chart above with a double asterisk (**). Michelle Heinz reserved both rooms in one reservation. Accordingly, TTS had no legitimate basis for charging her twice the regular fees for one reservation.

140. Michelle Heinz is aware that she could have obtained a better price using her travel agent rate compared to the rate she paid by booking via TTS's platform on at least one occasion. When she compared prices, she was comparing TTS's rate for the same hotel, same room type, and same flexibility as the room she could have booked using her travel agent rate.

141. After booking hotel rooms via TTS for several years and paying mandatory fees on top of higher rates than her travel agent rate, Michelle Heinz learned from a friend that only 80% of each team needed to reserve rooms via TTS. Since then, she has booked hotel rooms without using TTS's platform for two competitions. Her daughter and her daughter's team were permitted to participate in those competitions, and she saved money by avoiding TTS's mandatory fees and by using travel agent rates.

142. Michelle Heinz's daughter still cheers, and Michelle Heinz is at risk of suffering further harm by TTS if it continues engaging in the deceptive and unfair practices described herein.

*Plaintiff Harmony Martin*

143. Harmony Martin is a California resident and the mother of a competitive

cheerleader.

144. Harmony Martin has reserved hotel rooms via TTS's platform on numerous occasions in connection with cheer competitions, including reservations at the following hotels:

a. Sheraton Suites Raleigh for the 2022 American Superstarz Raleigh Nationals in Raleigh, North Carolina, which she booked on September 10, 2021;

b. Doubletree Hotel Charlotte Center City for the 2023 Spirit of Hope Grand Nationals in Charlotte, North Carolina, which she booked on September 12, 2022;

c. Embassy Suites Tampa Airport Westshore for the 2023 Youth Summit & The Varsity All Star CELEBRATION in Tampa, Florida, which she booked on January 2, 2023;

d. Element Dallas Downtown East for the 2024 NCA All-Star National Championship in Dallas, Texas, which she booked on February 9, 2024;

e. Country Inn & Suites by Radisson, Tampa Airport East and Tampa Marriott Water Street for the 2024 Youth Summit & The Rec Summit in Tampa, Florida, which she booked on March 9, 2024, and March 13, 2024 (she canceled her first reservation at Country Inn & Suites by Radisson, Tampa Airport East);

f. Residence Inn by Marriott Dallas Downtown for the 2025 NCA All-Star National Championship in Dallas, Texas, which she booked on October 24, 2024;

g. Riviera Resort & Spa Palm Springs for the 2026 Spirit Sports Grand Nationals in Palm Springs, California, which she booked on August 26, 2025; and

h. Crowne Plaza Houston Med Center for the 2026 NCA All-Star National

Championship in Houston, Texas, which she booked on November 13, 2025.

145. Harmony Martin has lived in California since July 2023. She made the reservations listed in subparagraphs (d) through (h) in the preceding paragraph from her home state of California.

146. Harmony Martin paid higher prices for hotel rooms than she would have had she not reserved rooms via TTS's platform, and she also paid the following mandatory fees, which TTS labeled "Booking," "Booking Service," "Booking & Service," "Cancel Convenience," and/or "Premier Property" fees, directly to TTS in connection each reservation:

| Fee Payment Date | Name of Competition | Type of Fee | Total Amount of Fee |
|---|---|---|---|
| Sept. 10, 2021 | 2022 American Superstarz Raleigh Nationals | Booking<br>Cancel Convenience^ | $3.99<br>$6.00 |
| Sept. 12, 2022 | 2023 Spirit of Hope Grand Nationals | Booking<br>Cancel Convenience^ | $3.99<br>$6.00 |
| Jan. 2, 2023 | 2023 Youth Summit & The Varsity All Star CELEBRATION | Booking<br>Cancel Convenience^ | $3.99<br>$6.00 |
| Feb. 9, 2024 | 2024 NCA All-Star National Championship | Booking<br>Cancel Convenience^ | $4.99<br>$7.00 |
| March 9, 2024 (canceled) | 2024 Youth Summit & The Rec Summit | Booking<br>Cancel Convenience^ | $4.99<br>$7.00 |
| March 13, 2024 | 2024 Youth Summit & The Rec Summit | Booking<br>Cancel Convenience | $4.99<br>$7.00 |
| Oct. 24, 2024 | 2025 NCA All-Star National Championship | Booking<br>Premier Property | $4.99<br>$7.00 |
| Aug. 26, 2025 | 2026 Spirit Sports Grand Nationals | Booking & Service* | $15.00 |
| Nov. 13, 2025 | 2026 NCA All-Star National Championship | Booking Service* | $20.00 |

147. Harmony Martin received no benefit in exchange for any of the fees she paid to TTS. Had she reserved rooms directly through the same hotels or other hotels of her choosing, she would not have had to pay any of the fees listed above and would have received comparable rooms, better rates, and comparable or more favorable cancellation policies.

148. Harmony Martin reserved rooms via TTS's platform because she was told by TTS and others that she was required to do so for her daughter to compete in the TTS-affiliated "Stay-to-Play" events. She would not have reserved rooms via TTS's platform had she not been told by TTS and others that there was a mandatory housing requirement that needed to be satisfied in order for her daughter's team to compete. TTS told her that there was a mandatory housing requirement and that she needed to book a hotel room via TTS during the booking flow on TTS's platform on or around the dates that she made the reservations identified above.

149. The fees that Harmony Martin paid to TTS on August 26, 2025, and November 13, 2025, which are marked with an asterisk (*) in the chart above, were charged on a per night basis, meaning she was charged $5.00 per night reserved even though she booked three nights in one transaction on August 26, 2025, and booked four nights in one transaction on November 13, 2025. Harmony Martin did not receive any benefit in exchange for these fees.

150. Harmony Martin did not receive any benefit in exchange for paying the "Cancel Convenience" fees to TTS. TTS even admits that it does not offer anything more than the regular hotel cancellation policy by describing the "Cancel Convenience" fee as follows on all of her reservation summaries that impose that fee: "All reservations equipped with TTS Cancel Convenience are eligible for free cancellation up until the hotel cancel policy."

151. The mandatory "Cancel Convenience" fees that Harmony Martin paid on Sept. 10, 2021, Sept. 12, 2022, January 2, 2023, February 9, 2024, and March 9, 2024, which are marked with a caret (^) in the chart above, did not provide any benefit to her whatsoever because she also paid the "Housing Protection" fee to TTS in connection with the same reservations. According to TTS, "When you purchase Housing Protection, you upgrade your booking and are eligible to receive a 100% refund if you cannot attend and can evidence one of the many reasons covered in

the Terms and Conditions."[62] Thus, for these reservations, Harmony Martin was forced to pay a mandatory "Cancel Convenience" fee to TTS even though she also opted for an "upgrade[d]" level of "protection" for her reservations.

152. Harmony Martin explored the possibility of applying for an exemption from TTS's "Stay-to-Play" mandate. Her husband is an active military member, and she wanted an exemption from TTS's "Stay-to-Play" policy so that she and her family could stay on a military base in Tampa, Florida for a lower rate. She was unable to get an exemption, however, because TTS required her to apply for an exemption at least 30 days before the event, and the military installation in Tampa, Florida does not allow members of the military to reserve rooms more than 30 days in advance. Harmony Martin would have saved money had she stayed in the military installation instead of a TTS-affiliated hotel.

153. Harmony Martin applied for an exemption from TTS's "Stay-to-Play" in connection with another competition. TTS initially denied her exemption request, but it ultimately granted her request based on her husband's active military rate after she appealed the denial. TTS harmed Harmony Martin by causing her to spend valuable time appealing the decision, which is time she could have otherwise spent with her family, working, or engaging in recreation.

154. Some of the hotel reservations that Harmony Martin made via TTS's platform were located as far as 40 minutes from the competition site by car. For example, when she stayed in the Element Dallas Downtown East for the 2024 NCA All-Star National Championship in Dallas, Texas, the drive was 30 to 45 minutes from the competition venue due to construction-related traffic. Similarly, when Harmony Martin stayed in the Crowne Plaza Houston Med Center for the

---

[62] Team Travel Source, *Housing Protection FAQs*, https://www.teamtravelsource.com/resources/faqs-housing-protection (last visited July 26, 2026).

2026 NCA All-Star National Championship in Houston, Texas, she experienced a long commute due to traffic on account of nearby road closures for parades related to the Houston Rodeo, which was held the same weekend.

155. Harmony Martin canceled her reservation at Country Inn & Suites by Radisson, Tampa Airport East for the 2024 Youth Summit & The Rec Summit in Tampa, Florida in part because the hotel was near the airport and not conveniently located near the competition. Harmony Martin and her family prefer to stay in hotels that are not located near airports because her daughter's team is sometimes scheduled for early or late competition slots, and she has experienced time-consuming traffic when traveling between hotels located near major airports and the event venues during those time periods.

156. Harmony Martin would have preferred to have stayed in AirBnBs, with family members, or at a military installation rather than reserve hotel rooms via TTS's platform for many of her daughter's cheer competitions. Some of the hotels she reserved via TTS's platform were not properly maintained and unsafe. For example, the hallway outside of her room at the Crowne Plaza Houston Med Center, which her family stayed in for the 2026 NCA All-Star National Championship, had an active leak from the ceiling. Her daughter felt unwell due to the mold caused by the leak.

157. Harmony Martin's daughter still participates in cheerleading, and Harmony Martin is at risk of suffering further harm by TTS if it continues engaging in the deceptive and unfair practices described herein.

*Plaintiff Ashley Cali*

158. Ashley Cali is a California resident and the mother of three competitive cheerleaders.

159. Ashley Cali has reserved hotel rooms via TTS's platform in connection with cheer competitions, including reservations at the following hotels:

a. Biltmore Los Angeles for the 2025 USA Cheer Super Nationals in Los Angeles in March 2025, which she reserved on October 8, 2024; and

b. Fairfield Inn & Suites Tampa Brandon for the 2025 Varsity Youth Summit in Tampa, Florida in April 2025, which she reserved on April 1, 2025.

160. Ashley Cali reserved rooms via TTS's platform because she was told by TTS and others that she was required to do so for her children to compete in the TTS-affiliated events. She would not have reserved rooms via TTS's platform if she had not been told by TTS and others that she was required to make reservations via TTS. TTS told her that she needed to book a hotel room via TTS during the initial phase of the booking flow on TTS's platform on or around October 8, 2024, and April 1, 2025.

161. Ashley Cali paid the following mandatory fees to TTS on the following dates:

| Fee Payment Date | Name of Competition | Type of Fee | Total Amount of Fee |
|---|---|---|---|
| October 8, 2024 | 2025 USA Cheer Super Nationals | Booking<br>Cancel Convenience | $4.99<br>$7.00 |
| April 1, 2025 | 2025 Varsity Youth Summit | Booking<br>Cancel Convenience | $4.99<br>$7.00 |

162. Ashley Cali received no benefit in exchange for any of the fees she paid to TTS. Had she reserved rooms directly through the same hotels or other hotels of her choosing, she would not have had to pay any of the fees listed above and would have received comparable rooms, better rates, and comparable or more favorable cancellation policies.

163. Ashley Cali did not receive any benefit in exchange for paying the "Cancel Convenience" fees to TTS. TTS even admits that it does not offer anything more than the regular hotel cancellation policy by describing the "Cancel Convenience" fee as follows on both of her

reservation summaries: "All reservations equipped with TTS Cancel Convenience are eligible for free cancellation up until the hotel cancel policy."

164. Ashley Cali has a brother who lives near Anaheim, California. When she was planning a trip for her children to compete in the 2026 USA All Star - Cheer Super Nationals & Dance Super Nationals at the Anaheim Convention Center, she decided to stay with her brother rather than at a hotel. She contacted TTS to request an exemption from the "Stay-to-Play" policy so that she could stay with family. TTS denied her request via email on January 19, 2026, stating: "Due to guidelines in place, we are not able to approve stays with friends and family. You are welcome to keep your stay as is, but we are not able to approve it for an exemption."

165. Because her request for an exemption was denied and she was told that her children would not be permitted to compete if she did not reserve a room, Ashley Cali and a friend booked a "ghost" room together, meaning they reserved and paid for a room that nobody used and also paid mandatory fees to TTS in connection with that reservation. Ashley Cali's friend made that reservation under her name and added one of Ashley Cali's children's names to the reservation, and Ashley Cali reimbursed her friend for a portion of the hotel cost and TTS fees.

166. TTS allows up to three athletes to be assigned to each reservation, so Ashley Cali and some of her cheer parent friends booked "ghost" rooms via TTS on other occasions as well. For example, Ashley Cali's friend once booked a "ghost" room via TTS for her own child and one of Ashley Cali's children at a hotel in Houston, Texas because the hotels offered by TTS were located in unsafe neighborhoods.

167. There were other instances when Ashley Cali's friends reserved "ghost" rooms via TTS for their own children and Ashley Cali's children because they were able to find deals on much nicer hotels in more convenient locations via hotels.com and other platforms. Ashley Cali

and her family have also stayed in Airbnb locations rather than the "ghost" rooms because they prefer lodging with kitchens over hotel rooms.

168. On every occasion when Ashley Cali's friends reserved ghost rooms and listed Ashley Cali's children on the reservation, Ashley Cali reimbursed her friends a portion of the hotel costs and mandatory fees they paid to TTS in connection with these "ghost" rooms that nobody used. Ashley Cali's friends would not have booked "ghost" rooms and Ashley Cali would not have contributed to paying for "ghost" rooms had TTS not told them that they were required to make reservations via TTS's platform.

169. Ashley Cali's children still participate in cheer competitions, and Ashley Cali is at risk of suffering further harm by TTS if it continues engaging in the deceptive and unfair practices described herein.

*Plaintiff Jennifer Costello*

170. Jennifer Costello is a resident of New York and the mother of a competitive cheerleader.

171. Since August 2021, Jennifer Costello has made at least 20 hotel reservations via TTS's platform in connection with cheer competitions, including reservations at the following hotels:

a. Holiday Inn Express Hotel & Suites Warwick-Providence (Arpt) at IHG Hotel for the 2022 Spirit Fest Providence Grand Nationals in Providence, Rhode Island, which she booked on August 17, 2021;

b. Showboat Resort Atlantic City for the 2022 Spirit Cheer Atlantic City Super Nationals in Atlantic City, New Jersey, which she booked on August 23, 2021;

c. Courtyard by Marriott Worcester for the 2022 ASC Queen of the Nile

Worcester Showdown in Worcester, Massachusetts, which she booked on August 23, 2021;

d. Fairfield Inn & Suites for the 2022 SU Battle of the Boardwalk Atlantic City Grand Nationals in Atlantic City, New Jersey, which she booked on August 23, 2021;

e. Home2 Suites by Hilton Fishers Indianapolis Northeast for the 2023 JAMfest Cheer Super Nationals in Indianapolis, Indiana, which she booked on October 7, 2022;

f. Best Western Ocean City Hotel & Suites for the 2023 Coastal at the Coast Grand Nationals in Ocean City, Maryland, which she booked on October 13, 2022;

g. Best Western Ocean City Hotel & Suites for the 2023 Coastal at the Coast Grand Nationals in Ocean City, Maryland, which she booked on January 23, 2023;

h. Holiday Inn Express and Suites Charlotte NE - University Area for the 2024 Spirit of Hope Grand Nationals in Charlotte, North Carolina, which she booked on September 9, 2023;

i. Holiday Inn Express and Suites Columbus Expo Center (2 rooms) for the 2024 Cheer Power Grand Nationals in Columbus, Ohio, which she booked on September 15, 2023;

j. Hilton Baltimore Inner Harbor for the 2024 ASC Queen of the Nile Baltimore Showdown in Baltimore, Maryland, which she booked on September 20, 2023;

k. Omni Resorts and Spa Charlotte for the 2025 Spirit of Hope Grand Nationals

in Charlotte, North Carolina, which she booked on September 13, 2024;

l. Tru by Hilton Charlotte Airport Lake Pointe (2 rooms) for the 2025 Spirit of Hope Grand Nationals in Charlotte, North Carolina, which she booked on September 13, 2024;

m. Hilton Garden Inn Providence/Warwick-Airport for the 2025 Athletic Championship Grand Nationals in Providence, Rhode Island, which she booked on September 13, 2024;

n. Omni Resorts and Spa Charlotte for the 2025 Spirit of Hope Grand Nationals in Charlotte, North Carolina, which she booked on September 16, 2024;

o. Omni Hotels & Resorts, Providence for the 2025 Athletic Championship Grand Nationals in Providence, Rhode Island, which she booked on September 16, 2024;

p. Embassy Suites Charlotte Uptown for the 2025 Spirit of Hope Grand Nationals in Charlotte, North Carolina, which she booked on January 3, 2025;

q. Hilton Atlanta for the 2026 CHEERSPORT National All Star Cheerleading Championship in Atlanta, Georgia, which she booked on October 30, 2025; and

r. Hilton Atlanta (2 rooms) for the 2026 CHEERSPORT National All Star Cheerleading Championship in Atlanta, Georgia, which she booked on November 3, 2025.

172. Jennifer Costello accessed TTS's platform and made these reservations online while she was in her home state of New York.

173. Jennifer Costello made these reservations via TTS's platform because TTS and others told her that her child would not be permitted to compete in the events if she did not book

a hotel reservation through TTS. She would not have made these reservations had she not been told by TTS during the initial stage of the booking process on TTS's platform that her child would be unable to compete if she did not reserve a hotel room via TTS.

174. Jennifer Costello was charged a "Booking Fee" and/or a "Cancel Convenience" fee, which she paid to TTS, in connection with each of these reservations at the time she made the reservations, including for reservations that were for waitlisted hotel rooms. She paid these mandatory fees on the following dates:

| Fee Payment Date | Name of Competition | Type of Fee | Total Amount of Fee |
|---|---|---|---|
| Aug. 17, 2021 | 2022 - Spirit Fest Providence Grand Nationals | Booking<br>Cancel Convenience | $3.99<br>$6.00 |
| Aug. 23, 2021 | 2022 - Spirit Cheer Atlantic City Super Nationals (canceled) | Booking<br>Cancel Convenience | $3.99<br>$6.00 |
| Aug. 23, 2021 | 2022 - ASC Queen of the Nile Worcester Showdown | Booking<br>Cancel Convenience | $3.99<br>$6.00 |
| Aug. 23, 2021 | 2022 - SU Battle at the Boardwalk Atlantic City Grand Nationals | Booking<br>Cancel Convenience | $3.99<br>$6.00 |
| Oct. 7, 2022 | 2023 - JAMfest - Cheer Super Nationals | Booking<br>Cancel Convenience | $3.99<br>$6.00 |
| Oct. 13, 2022 | 2023 - Coastal at the Coast-Grand Nationals DI/DII (canceled) | Booking<br>Cancel Convenience | $3.99<br>$6.00 |
| Jan. 23, 2023 | 2023 - Coastal at the Coast-Grand Nationals DI/DII | Booking<br>Cancel Convenience | $3.99<br>$6.00 |
| Sept. 9, 2023 | 2024 - Spirit of Hope - Grand Nationals | Booking<br>Cancel Convenience | $4.99<br>$7.00 |
| Sept. 15, 2023 | 2024 - Cheer Power - Grand Nationals (canceled) | Booking<br>Cancel Convenience | $4.99<br>$7.00 |
| Sept. 20, 2023 | 2024 - ASC - Queen of the Nile - Baltimore – Showdown | Booking<br>Cancel Convenience | $4.99<br>$7.00 |
| Sept. 13, 2024 | 2025 - Spirit of Hope - Grand Nationals | Booking<br>Cancel Convenience | $4.99<br>$7.00 |

| | | | |
|---|---|---|---|
| | (canceled) | | |
| Sept. 13, 2024 | 2025 - Spirit of Hope - Grand Nationals (canceled) | Booking<br>Cancel Convenience | $4.99<br>$7.00 |
| Sept. 16, 2024 | 2025 - Athletic Championships - Grand Nationals | Booking<br>Cancel Convenience | $4.99<br>$7.00 |
| Jan. 3, 2025 | 2025 Spirit of Hope Grand Nationals | Booking<br>Cancel Convenience | $4.99<br>$7.00 |
| Oct. 30, 2025 | 2026 - CHEERSPORT National All Star Cheerleading Championship (canceled) | Booking Service* | $15.00 |
| Nov. 3, 2025 | 2026 - CHEERSPORT National All Star Cheerleading Championship | Booking Service* | $15.00 |

175. The fees that Jennifer Costello paid to TTS on October 30, 2025, and November 3, 2025, which are marked with an asterisk (*) in the chart above, were charged on a per night basis, meaning she was charged $5.00 per night reserved even though she booked three nights during each transaction (one transaction on October 30, 2025, and one transaction on November 3, 2025), as opposed to a separate transaction for each night. Jennifer Costello did not receive any benefit in exchange for paying these fees.

176. Jennifer Costello did not receive any benefit in exchange for paying the "Cancel Convenience" fees to TTS. TTS even admits that it does not offer anything more than the regular hotel cancellation policy by describing the "Cancel Convenience" fee as follows on all of Jennifer Costello's reservation summaries that impose that fee: "All reservations equipped with TTS Cancel Convenience are eligible for free cancellation up until the hotel cancel policy."

177. Jennifer Costello would have preferred to have stayed in hotels or other lodging of her choice rather than reserve hotel rooms via TTS. Jennifer Costello was harmed by TTS's deceptive and unfair practices because she paid higher prices for lodging and paid mandatory fees

imposed by TTS that did not benefit her.

178. Jennifer Costello's daughter still participates in cheer competitions, and Jennifer Costello is at risk of suffering further harm by TTS if it continues engaging in the deceptive and unfair practices described herein.

*Plaintiff Aleisha Kelley*

179. Aleisha Kelley is an individual citizen of the State of Oklahoma and the mother of a competitive volleyball player.

180. Aleisha Kelley has reserved hotel rooms via TTS's platform on numerous occasions in connection with volleyball tournaments, including reservations at the following hotels:

a. La Quinta Inn by Wyndham South Jordan for the 2026 - USAV Salt Lake City Showdown Girls Qualifier (Week One), which she booked on November 21, 2025;

b. Holiday Inn Express and Suites Kansas City-Liberty (Hwy 152) for the 2026 - Asics Show Me National Qualifier - Week 1, which she booked on November 10, 2025;

c. Hampton Inn & Suites Kansas City Country Club Plaza for the 2023 - Asics Show Me National Qualifier - Week 2, which she booked on December 27, 2022 (two rooms were booked in the same reservation); and

d. The Westin Kansas City at Crown Center for the 2023 - KC Martin Luther King Day Tournament (MLK), which she booked on November 15, 2022.

181. Aleisha Kelley was an Oklahoma resident when she made all of the above reservations. She made these reservations while she was located in her home state of Oklahoma.

182. Aleisha Kelley reserved rooms via TTS's platform because she was told by TTS

and others that she was required to do so for her daughter to compete in the TTS-affiliated "Stay-to-Play" tournaments. Specifically, she received emails from her daughter's coach directing her to a TTS website in which TTS told her that she was required to make reservations via TTS's platform. She would not have reserved rooms via TTS's platform had she not been told by TTS and others that there was a "Stay-to-Play" requirement that needed to be satisfied so that her daughter's team could participate. TTS told her about the requirement during the booking flow on TTS's platform on or around the dates that she made the reservations identified above.

183. For example, the TTS website link that Aleisha Kelley received from her daughter's volleyball coach via email on November 10, 2025, which is now labeled as "inactive" in the URL, includes the following statement: "This event is Stay to Play and does require ALL bookings be made through this site."[63] The website includes TTS's name, website, contact information, and hours. A chatbox icon on the website opens a window that shows "Chat with Team Travel Source" at the top. Aleisha Kelley believed TTS's statement that she was required to make reservations through TTS.

184. Aleisha Kelley paid higher prices for hotel rooms reserved through TTS than she would have had she not made reservations via TTS's platform. She knows this because she made a hotel reservation for the 2026 Asics Show Me National Qualifier through TTS on November 10, 2025, and then she booked another room in the same hotel for family members directly through the hotel. The room that she booked directly through the hotel was significantly less expensive than the room she booked via TTS.

185. TTS advertises its "Lowest Rate Guarantee" on its website, which Aleisha Kelley

---

[63] Event Pipe, *2026 – Asics Show Me National Qualifier – Week 1*, https://app.eventpipe.com/event/872eb551-c9b3-4672-938d-c968f14e517e/inactive (last visited July 27, 2026).

viewed in November 2025. On November 21, 2025, Aleisha Kelley used TTS's online "Report a Lower Rate" form to notify TTS that she had obtained a lower rate at the Holiday Inn Express & Suites Kansas City-Liberty (HWY 152). She submitted screenshots to TTS evidencing that she was able to reserve a standard room with two queen beds at the Holiday Inn Express & Suites Kansas City-Liberty (HWY 152) from April 10, 2026, to April 13, 2026, for only $522.99, inclusive of fees and taxes. That reservation enabled her to cancel without penalty until 6:00 p.m. on Thursday, April 9, 2026. In contrast, Aleisha Kelley paid $701.73, inclusive of fees and taxes, for the room she reserved via TTS, which also had two queen beds. Additionally, even though she paid more for the room she reserved via TTS, the cancellation policy was more restrictive. Specifically, her TTS reservation summary stated that she was required to change or cancel the reservation 48 hours prior to arrival to avoid penalties.

186. Aleisha Kelley expected TTS to match the price she found directly through the Holiday Inn Express & Suites Kansas City-Liberty (HWY 152), but TTS denied her request via email on November 21, 2025, stating: "Member rates are not eligible for the low rate guarantee." The same day, Aleisha Kelley appealed the denial via email, stating in part: "To be honest, I find the general answer a little ridiculous considering a member rate only requires you join their loyalty program, it's not booked with any sort of status or credit card based reduced cost." She also attached screenshots of the non-member rates for the same room, which were still lower than the cost of reserving the room through TTS. TTS did not adjust her rate even though she demonstrated that the hotel offered a lower, non-member rate.

187. To make matters worse, the Holiday Inn Express & Suites Kansas City-Liberty (HWY 152) was a run-down hotel located approximately 15 miles from the tournament site. The rooms were dingy, the painted tubs were peeling, and another family on the team staying at the

hotel saw what appeared to be a plastic bag over a smoke alarm. Aleisha Kelley would have never stayed in a hotel of that low quality had TTS not coerced her into making a hotel reservation via TTS. She would have selected alternate lodging that was more affordable, closer to the tournament venue, and higher quality.

188. In addition to paying inflated prices, Aleisha Kelley also paid the following mandatory junk fees, which TTS labeled “Booking,” “Cancel Convenience,” and/or “Housing” fees, directly to TTS on the following dates:

| Fee Payment Date | Name of Competition | Type of Fee | Total Amount of Fee |
|---|---|---|---|
| 11/21/2025 | 2026 - USAV Salt Lake City Showdown Girls Qualifier (Week One) | Booking<br>Housing | $6.00<br>$45.00 |
| 11/10/2025 | 2026 - Asics Show Me National Qualifier - Week 1 | Booking<br>Housing | $6.00<br>$45.00 |
| 12/27/2022 | 2023 - Asics Show Me National Qualifier - Week 2 | Booking*<br>Cancel Convenience* | $7.98<br>$12.00 |
| 11/15/2022 | 2023 - KC Martin Luther King Day Tournament (MLK) | Booking<br>Cancel Convenience | $3.99<br>$6.00 |

189. Aleisha Kelley received no benefit in exchange for any of the fees she paid to TTS. Had she reserved rooms directly through the same hotels or other hotels of her choosing, she would not have had to pay any of the fees to TTS listed above and would have received comparable rooms, better rates, and comparable or more favorable cancellation policies.

190. The mandatory junk fees that Aleisha Kelley paid to TTS on November 21, 2025, and November 10, 2025, were described by TTS on the reservation summaries as follows: “A non-refundable per night booking fee of $2 and a non-refundable per night housing fee of $15 is required at the time of booking.” Aleisha Kelley did not receive any benefit from either the booking fee or the housing fee and does not know why a hotel would charge a “housing” fee considering

the product it offers is short-term housing. Additionally, TTS had no legitimate reason for charging these fees on a per night basis.

191. The mandatory fees that Aleisha Kelley paid to TTS on December 27, 2022, which are noted with an asterisk (*) above, were doubled by TTS because Aleisha Kelley reserved two rooms and the charges were applied on a per room basis. TTS had no legitimate reason for charging her two booking fees when both rooms were reserved in the same reservation.

192. Similarly, Aleisha Kelley did not receive any benefit in exchange for paying the mandatory "Cancel Convenience" fees to TTS on November 15, 2022, and December 27, 2022. TTS even admits that it does not offer anything more than the regular hotel cancellation policy by describing the "Cancel Convenience" fee as follows on the reservation summaries: "All reservations equipped with TTS Cancel Convenience are eligible for free cancellation up until 72 hours prior to arrival. If hotel cancellation policy is less than 72 hours, then the hotel cancellation policy will apply." As stated above, Aleisha Kelley found that TTS's cancellation policy in November 2025 was less favorable than the Holiday Inn Express & Suites Kansas City-Liberty (HWY 152) policy during the same month.

193. Aleisha Kelley's daughter still plays volleyball, and Aleisha Kelley is at risk of suffering further harm by TTS if it continues engaging in the deceptive and unfair practices described herein.

*Plaintiff Stacie Isaacs*

194. Stacie Isaacs is an individual citizen of the Commonwealth of Virginia and the mother of a competitive cheerleader.

195. Stacie Isaacs has reserved hotel rooms via TTS's platform on numerous occasions in connection with cheer competitions, including reservations at the following hotels:

a. Hilton Baltimore Inner Harbor for the 2023 - The American Masters Baltimore Nationals DI DII and Champion Cheer & Dance Grand Nationals Dance, which she booked on August 31, 2022;

b. Gaylord Opryland Resort & Convention Center for the 2023 - One Up - Grand Nationals - DI/DII, which she booked on September 14, 2022;

c. Hilton Orlando for the 2023 - THE ONE Cheer & Dance Finals Southeast, which she booked on January 11, 2023;

d. Hilton Baltimore Inner Harbor for the 2023 - Champion Cheer and Dance - Grand Nationals (Cheer), which she booked on August 29, 2023;

e. Hyatt House Atlanta Downtown for the 2024 - CHEERSPORT National All Star Cheerleading Championship, which she booked on September 21, 2023 (two separate reservations made on the same day);

f. Hampton Inn Downtown Tampa - Channel District for the 2024 - The Youth Summit & The Rec Summit, which she booked on January 18, 2024 and March 27, 2024 (two separate reservations);

g. The Barrymore Hotel Tampa Riverwalk Tampa for the 2024 - The Youth Summit & The Rec Summit, which she booked on January 18, 2024;

h. Hampton Inn by Hilton Tampa-Ybor City/Downtown for the 2024 - The Youth Summit & The Rec Summit, which she booked on January 18, 2024;

i. Hilton Baltimore Inner Harbor for the 2024 - Champion Cheer and Dance - Grand Nationals (Cheer & Dance), which she booked on September 3, 2024 and September 4, 2024 (two separate reservations);

j. Gaylord National Harbor Resort and Convention Center for the 2025 - Coastal

at the Capitol - Grand Nationals, which she booked on September 11, 2024;

k. Hotel Indigo Atlanta Midtown, an IHG Hotel for the 2025 - CHEERSPORT National All Star Cheerleading Championship, which she booked on December 3, 2024;

l. Curio Collection The Starling Atlanta Midtown for the 2025 - CHEERSPORT National All Star Cheerleading Championship, which she booked on October 18, 2024;

m. Westin Hotels & Resorts Peachtree Plaza, Atlanta for the 2025 - CHEERSPORT National All Star Cheerleading Championship, which she booked on October 18, 2024;

n. Gaylord Opryland Resort & Convention Center for the 2025 - One Up Grand Nationals, which she booked on September 17, 2024;

o. Hampton Inn Downtown Tampa - Channel District for the 2025 - The Youth Summit, Rec Summit & The Varsity All Star CELEBRATION, which she booked on December 3, 2024; and

p. Residence Inn Clearwater Beach for the 2025 - The Youth Summit, Rec Summit & The Varsity All Star CELEBRATION, which she booked on December 3, 2024.

196. Stacie Isaacs was a Virginia resident when she made all of the above reservations. She made the reservations listed above while she was located in the Commonwealth of Virginia.

197. Stacie Isaacs paid higher prices for hotel rooms than she would have had she not reserved rooms via TTS's platform, and she also paid the following mandatory fees, which TTS labeled "Booking," "Cancel Convenience," and/or "Premier Property" fees, directly to TTS on the

following dates:

| Fee Payment Date | Name of Competition | Type of Fee | Total Amount of Fee |
|---|---|---|---|
| Dec. 3, 2024 | 2025 - The Youth Summit, Rec Summit & The Varsity All Star CELEBRATION | Booking<br>Cancel Convenience* | $4.99<br>$7.00 |
| Sept. 17, 2024 | 2025 - One Up Grand Nationals | Booking<br>Premier Property | $4.99<br>$7.00 |
| Oct. 18, 2024 | 2025 - CHEERSPORT National All Star Cheerleading Championship | Booking<br>Cancel Convenience* | $4.99<br>$7.00 |
| Dec. 3, 2024 | 2025 - CHEERSPORT National All Star Cheerleading Championship | Booking<br>Cancel Convenience* | $4.99<br>$7.00 |
| Sept. 11, 2024 | 2025 - Coastal at the Capitol - Grand Nationals | Booking<br>Premier Property | $4.99<br>$7.00 |
| Sept. 3, 2024 | 2024 - Champion Cheer and Dance - Grand Nationals (Cheer & Dance) | Booking<br>Cancel Convenience* | $4.99<br>$7.00 |
| Sept. 4, 2024 | 2024 - Champion Cheer and Dance - Grand Nationals (Cheer & Dance) | Booking<br>Cancel Convenience* | $4.99<br>$7.00 |
| Jan. 18, 2024 | 2024 - The Youth Summit & The Rec Summit | Booking<br>Cancel Convenience* | $4.99<br>$7.00 |
| Jan. 18, 2024 | 2024 - The Youth Summit & The Rec Summit | Booking<br>Cancel Convenience* | $4.99<br>$7.00 |
| March 27, 2024 | 2024 - The Youth Summit & The Rec Summit | Booking<br>Cancel Convenience* | $4.99<br>$7.00 |
| Sept. 21, 2023 | 2024 - CHEERSPORT National All Star Cheerleading Championship | Booking<br>Premier Property | $4.99<br>$7.00 |
| Aug. 29, 2023 | 2023 - Champion Cheer and Dance - Grand Nationals (Cheer) | Booking<br>Cancel Convenience*^ | $4.99<br>$7.00 |

| | | | |
|---|---|---|---|
| Jan. 11, 2023 | 2023 - THE ONE Cheer & Dance Finals Southeast | Booking<br>Cancel Convenience**^ | $3.99<br>$6.00 |
| Sept. 14, 2022 | 2023 - One Up - Grand Nationals - DI/DII | Booking<br>Premier Property | $3.99<br>$6.00 |
| Aug. 31, 2022 | 2023 - The American Masters Baltimore Nationals DI DII and Champion Cheer & Dance Grand Nationals Dance | Booking<br>Cancel Convenience**^ | $3.99<br>$6.00 |

198. Stacie Isaacs received no benefit in exchange for any of the fees she paid to TTS. Had she reserved rooms directly through the same hotels or other hotels of her choosing, she would not have had to pay any of the fees to TTS listed above and would have received comparable rooms, better rates, and comparable or more favorable cancellation policies.

199. Stacie Isaacs reserved rooms via TTS's platform because she was told by TTS and others that she was required to do so for her daughter to compete in the TTS-affiliated "Stay-to-Play" events. She would not have reserved rooms via TTS's platform had she not been told by TTS and others that there was a mandatory housing requirement that needed to be satisfied in order for her daughter's team to compete. TTS told her that there was a mandatory housing requirement and that she needed to book a hotel room via TTS during the booking flow on TTS's platform on or around the dates that she made the reservations identified above.

200. Stacie Isaacs would have preferred to book lodging of her choice rather than be limited to the options provided by TTS. Booking via TTS's platform was more expensive than other options, and the available TTS-affiliated hotels were often located far from the competition venues. In Stacie Isaacs's experience, the TTS hotel blocks located near the venues were often sold out before she received the TTS link to make reservations. As a result, Stacie Isaacs and other families on her daughter's cheer team stayed far from the competition venues and paid higher

prices for less convenience than if they had not been deceived by TTS into believing that they were required to make hotel reservations through TTS.

201. Stacie Isaacs did not receive any benefit in exchange for paying the "Cancel Convenience" fees to TTS. TTS even admits that it does not offer anything more than the regular hotel cancellation policy by describing the "Cancel Convenience" fee as follows on the reservation summaries marked with an asterisk (*) above: "All reservations equipped with TTS Cancel Convenience are eligible for free cancellation up until the hotel cancel policy." Similarly, TTS stated on the reservation summaries marked with a double asterisk (**) above: "All reservations equipped with TTS Cancel Convenience are eligible for free cancellation up until 72 hours prior to arrival. If hotel cancellation policy is less than 72 hours, then the hotel cancellation policy will apply."

202. The mandatory "Cancel Convenience" fees that Stacie Isaacs paid on August 29, 2023, January 11, 2023, and August 31, 2022, which are marked with a caret (^) in the chart above, did not provide any benefit to her whatsoever because she also paid the "Housing Protection" fee to TTS in connection with the same reservations. According to TTS, "When you purchase Housing Protection, you upgrade your booking and are eligible to receive a 100% refund if you cannot attend and can evidence one of the many reasons covered in the Terms and Conditions."[64] Thus, for these reservations, Stacie Isaacs was forced to pay a mandatory "Cancel Convenience" fee to TTS even though she also opted for what TTS referred to in her reservation summaries as an "upgrade[d]" level of "protection" for her reservations.

203. In addition to charging the mandatory junk fees listed above, for which Stacie Isaacs received no benefit in return, on September 14, 2022, and September 11, 2024, TTS failed

[64] Team Travel Source, *supra* note 62.

to adequately disclose another mandatory junk fee and failed to display the true total cost of the reservation. A daily resort fee of $27.00 was applied to the reservation she made on September 11, 2024, and a daily resort fee of $25.00 was applied to the reservation she made on September 14, 2022. Neither of these fees appear on the total amount or the itemized summaries of charges provided by TTS, and TTS admitted in the reservation summaries that the fees are: "not included in the per night room rate." TTS also failed to disclose that the resort fee would be applied on a nightly basis. As a result, Stacie Isaacs paid significantly more than the "Total due" amount listed on the reservation summaries for these bookings.

204. Stacie Isaacs's daughter is still a competitive cheerleader, and Stacie Isaacs is at risk of suffering further harm by TTS if it continues engaging in the deceptive and unfair practices described herein.

*Plaintiff Diana Ferrara*

205. Diana Ferrara is an individual citizen of the Commonwealth of Massachusetts.

206. Diana Ferrara has reserved hotel rooms via TTS's platform on numerous occasions in connection with cheer competitions, including reservations at the following hotels:

a. Gaylord Opryland Resort & Convention Center for the 2025 - One Up Grand Nationals, which she booked on January 22, 2025;

b. The Westin DC Downtown for the 2026 - Coastal at the Capitol - Super Nationals DI & DII, which she booked on January 11, 2025; and

c. Sheraton Sand Key Resort for the 2026 - The Youth Summit, Rec Summit & The Varsity All Star CELEBRATION, which she booked on February 24, 2026. She made two separate reservations at this same hotel on February 24, 2026.

207. Diana Ferrara was a Massachusetts resident when she made all of the above

reservations. She made the reservations listed above while she was in the Commonwealth of Massachusetts.

208. Diana Ferrara paid higher prices for hotel rooms than she would have had she not reserved rooms via TTS's platform, and she also paid the following mandatory fees, which TTS labeled "Booking," "Booking Service," and/or "Premier Property" fees, directly to TTS on the following dates:

| Fee Payment Date | Name of Competition | Type of Fee | Total Amount of Fee |
|---|---|---|---|
| Jan. 22, 2025 | 2025 - One Up Grand Nationals | Booking<br>Premier Property | $4.99<br>$7.00 |
| Jan. 11, 2025 | 2026 - Coastal at the Capitol - Super Nationals DI & DII | Booking Service | $20.00 |
| Feb. 24, 2026 | 2026 - The Youth Summit, Rec Summit & The Varsity All Star CELEBRATION | Booking Service | $15.00 |

209. In addition to charging the mandatory junk fees listed above, for which Diana Ferrara received no benefit in return, on January 22, 2025, TTS failed to adequately disclose another mandatory junk fee and failed to display the true total cost of the reservation. A daily resort fee of $28.00 was applied to her reservation, which does not appear on the total amount or the itemized summary of charges, and which TTS admitted in the reservation summary: "is not included in the per night room rate." TTS also failed to disclose that the resort fee would be applied on a nightly basis. As a result, Diana Ferrara paid significantly more than the "Total due" amount listed on her reservation summary.

210. Diana Ferrara received no benefit in exchange for any of the fees she paid to TTS. Had she reserved rooms directly through the same hotels or other hotels of her choosing, she would not have had to pay any of the fees listed above and would have received comparable rooms, better

rates, and comparable or more favorable cancellation policies.

211. Diana Ferrara reserved rooms via TTS's platform because she was told by TTS and others that she was required to do so for her daughter to compete in the TTS-affiliated "Stay-to-Play" events. She would not have reserved rooms via TTS's platform had she not been told by TTS and others that there was a mandatory housing requirement that needed to be satisfied in order for her daughter's team to compete. TTS told her that there was a mandatory housing requirement and that she needed to book a hotel room via TTS during the booking flow on TTS's platform on or around the dates that she made the reservations identified above.

212. Even according to TTS's own unfair policy, TTS overcharged Diana Ferrara on January 11, 2025, when TTS charged her a $20.00 "Booking Service" fee. The reservation Diana Ferrara made that day was for a 3-night stay, and TTS stated on the reservation summary: "A non-refundable per night booking fee of $5.00 is required at the time of booking." Thus, TTS unfairly overcharged Diana Ferrara $5.00 on January 11, 2025. On information and belief, TTS overcharged other Massachusetts citizens in connection with the 2026 - Coastal at the Capitol - Super Nationals DI & DII and other events.

213. Diana Ferrara's daughter is still a competitive cheerleader, and Diana Ferrara is at risk of suffering further harm by TTS if it continues engaging in the deceptive and unfair practices described herein.

214. Pursuant to MCPA §9(3), Diana Ferrara, through her attorneys, sent a written demand for relief to TTS by email on June 24, 2026, describing the unfair and deceptive acts and the injury she suffered. TTS did not make a reasonable written tender of settlement within thirty days.

*Plaintiff Nicole Ledvina*

215. Nicole Ledvina is a resident of Illinois and the mother of a competitive cheerleader.

216. Nicole Ledvina has booked hotel rooms via TTS and paid mandatory fees to TTS in connection with "Stay-to-Play" cheer competitions numerous times because she was told by TTS and others that her daughter would not be able to compete if she did not reserve hotel rooms via TTS's platform. She made these reservations while she was in her home state of Illinois.

217. The hotel reservations that Nicole Ledvina made via TTS's platform in connection with cheer competitions include the following:

| Hotel Name | Competition Name | Reservation Date | Hotel Stay Dates |
|---|---|---|---|
| Holiday Inn Express and Suites Louisville Downtown | 2024 - WSF - Grand Nationals | 9/3/2024 | 12/06/2024 - 12/08/2024 |
| Embassy Suites Indianapolis Downtown | 2025 - The Midwest Regional Summit | 11/20/2024 | 04/11/2025 - 04/13/2025 |
| Holiday Inn Express and Suites Louisville Airport Expo Center | 2025 - WSF - Grand Nationals | 9/3/2025 | 12/05/2025 - 12/07/2025 |
| Springhill Suites by Marriott Atlanta Buckhead | 2026 - CHEERSPORT National All Star Cheerleading Championship | 10/17/2025 | 02/13/2026 - 02/16/2026 |

218. When Nicole Ledvina made hotel reservations on or about the dates listed in the chart in the preceding paragraph, she did so because TTS told her during the initial phase of the booking process on TTS's platform that she was required to make hotel reservations via TTS. Nicole Ledvina received emails from her daughter's cheer gym directing her to make hotel reservations via a link, which took her directly to TTS's platform. Once she arrived at TTS's platform on or about the dates she made the reservations listed above, she read TTS's statements about Stay-to-Play requirements and TTS's statements that all bookings must be made through TTS.

219. Nicole Ledvina paid mandatory "Booking," "Booking Service," and "Cancel Convenience" fees to TTS in connection with her hotel reservations, including the fees paid on the following dates:

| Fee Payment Date | Name of Competition | Type of Fee | Total Amount of Fee |
|---|---|---|---|
| 9/3/2024 | 2024 - WSF - Grand Nationals | Booking<br>Cancel Convenience^ | $4.99<br>$7.00 |
| 11/20/2024 | 2025 - The Midwest Regional Summit | Booking<br>Cancel Convenience | $4.99<br>$7.00 |
| 9/3/2025 | 2025 - WSF - Grand Nationals | Booking Service* | $10.00 |
| 10/17/2025 | 2026 - CHEERSPORT National All Star Cheerleading Championship | Booking Service* | $15.00 |

220. Nicole Ledvina received no benefit in exchange for any of the fees she paid to TTS. Had she reserved rooms directly through the same hotels or other hotels of her choosing, she would not have had to pay any of the fees listed above and would have received comparable rooms, better rates, and comparable or more favorable cancellation policies.

221. Nicole Ledvina received no benefits in exchange for the mandatory "Booking" and "Booking Service" fees that she paid to TTS. She could have made reservations directly with hotels or via other third-party booking platforms and not incurred a "Booking" or "Booking Service" fee had TTS not told her that she was required to reserve a room via its platform.

222. TTS charged Nicole Ledvina mandatory "Booking Service" fees on a per night basis at $5.00 per night even though she booked a two-night stay in one transaction on September 3, 2025, and a three-night stay in one transaction on October 17, 2025. She paid these "Booking Service Fees" directly to TTS when she made these reservations and did not receive any benefit in exchange for the fees.

223. Nicole Ledvina did not receive any benefit in exchange for paying the "Cancel

Convenience" fees to TTS. TTS even admits that it does not offer anything more than the regular hotel cancellation policy. For example, on the reservation summaries in connection with the reservations Nicole Ledvina made on September 3, 2024, and November 20, 2024, TTS stated: "All reservations equipped with TTS Cancel Convenience are eligible for free cancellation up until the hotel cancel policy." Thus, TTS provided no benefit in exchange for the "Cancel Convenience" fees it charged Nicole Ledvina.

224. The mandatory "Cancel Convenience" fee that Nicole Ledvina paid on September 3, 2024, which is marked with a caret (^) in the chart above, also did not provide any benefit to Nicole Ledvina because she paid the "Housing Protection" fee to TTS in connection with the same reservation. According to TTS, "When you purchase Housing Protection, you upgrade your booking and are eligible to receive a 100% refund if you cannot attend and can evidence one of the many reasons covered in the Terms and Conditions."[65] Thus, for this reservation, Nicole Ledvina was forced to pay a mandatory "Cancel Convenience" fee to TTS even though she also opted and paid for an "upgrade[d]" level of "protection" for her reservation.

225. Nicole Ledvina would not have made any hotel reservations via TTS's platform had TTS not told her that she must to do so to comply with Stay-to-Play requirements. There were more affordable hotel options that she could have booked. Even if Nicole Ledvina chose to stay in the same hotels on the same dates, she would have saved money by booking directly with those hotels because she would have avoided the junk fees imposed by TTS.

226. Nicole Ledvina's daughter still participates in competitive cheerleading, and Nicole Ledvina is at risk of suffering further harm by TTS if it continues engaging in the deceptive and unfair practices described herein.

[65] *Id.*

## CLASS ALLEGATIONS

227. This action is brought and may properly proceed as a class action pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), including, without limitation, Sections (b)(2) and (b)(3) of Rule 23.

228. Plaintiffs seek certification of the following classes (the "Classes"):

**Nationwide Class:** All persons who, during the five (5) years preceding the filing of this action through the present or the date of certification of a class, whichever is later, booked a hotel room via TTS's platform and were charged a mandatory junk fee.

**Kentucky Subclass:** All Kentucky residents who, during the three (3) years preceding the filing of this action through the present or the date of certification of a class, whichever is later, booked a hotel room via TTS's platform and were charged a mandatory junk fee.

**California Subclass:** All California residents who, during the four (4) years preceding the filing of this action through the present or the date of certification of a class, whichever is later, booked a hotel room via TTS's platform and were charged a mandatory junk fee.

**New York Subclass:** All New York residents who, during the three (3) years preceding the filing of this action through the present or the date of certification of a class, whichever is later, booked a hotel room via TTS's platform and were charged a mandatory junk fee.

**Oklahoma Subclass:** All Oklahoma residents who, during the two (2) years preceding the filing of this action through the present or the date of certification of

a class, whichever is later, booked a hotel room via TTS's platform and were charged a mandatory junk fee.

**Virginia Subclass:** All Virginia residents who, during the two (2) years preceding the filing of this action through the present or the date of certification of a class, whichever is later, booked a hotel room via TTS's platform and were charged a mandatory junk fee.

**Massachusetts Subclass:** All Massachusetts residents who, during the four (4) years preceding the filing of this action through the present or the date of certification of a class, whichever is later, booked a hotel room via TTS's platform and were charged a mandatory junk fee.

**Illinois Subclass:** All Illinois residents who, during the three (3) years preceding the filing of this action through the present or the date of certification of a class, whichever is later, booked a hotel room via TTS's platform and were charged a mandatory junk fee.

229. Plaintiffs explicitly reserve their right to amend, add to, modify, and/or otherwise change the proposed class definitions as discovery in this action progresses.

230. The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action, members of their staffs (including judicial clerks), and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest, and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel, and non-

attorney employees of their firms; (6) any person who has entered into a valid and enforceable arbitration agreement with Defendant that covers the claims at issue in this action; and (7) the legal representatives, successors, and assigns of any such excluded persons.

231. **Numerosity:** Plaintiffs are informed and believe that there are tens of thousands, if not millions, of members of the Classes. The Classes are so large that the joinder of all of their members is impracticable. Although the precise number of putative members of the Classes is unknown, the facts on which the calculation of that number depends are presently within the sole control of Defendant and the members of the Classes are ascertainable from Defendant's records.

232. **Commonality:** Defendant has acted on grounds that apply generally to members of the Classes. Absent certification of the Classes, the relief sought herein creates the possibility of inconsistent judgments and/or obligations imposed on Defendant. Numerous common issues of fact and law exist, including, without limitation:

a. Whether Defendant's conduct as detailed in this First Amended Complaint is unfair.

b. Whether Defendant's conduct as detailed in this First Amended Complaint is unconscionable.

c. Whether Defendant's conduct as detailed in this First Amended Complaint constitutes false, misleading, and/or deceptive acts.

d. Whether Defendant is a "person" within the meaning of KRS § 367.110(1).

e. Whether Defendant was engaged in trade and/or commerce when it offered and sold hotel reservation services to Plaintiffs and members of the Classes.

f. Whether Defendant was engaged in consumer-oriented conduct when it offered and sold hotel reservation services to Plaintiffs and members of the Classes.

g. Whether Defendant's actions and conduct constituted transactions for the sale or lease of goods or services to consumers.

h. Whether Plaintiffs and members of the Classes were "persons who purchase[d]" TTS's services within the meaning of KRS § 367.220(1) when they booked hotel accommodations via TTS's platform.

i. Whether Plaintiffs and members of the Classes agreed to purchase Defendant's services primarily for personal, family, or household purposes when they booked hotel accommodations via TTS's platform in connection with participating in a TTS-affiliated event.

j. Whether Defendant makes standardized representations to Plaintiffs and members of the Classes.

k. Whether Defendant's representations regarding the nature of the mandatory fees it charged Plaintiffs and members of the Classes, the requirement to book hotel stays via TTS's platform in order for their children to participate in affiliated events, the reason for the Stay-to-Play policy, benefits to consumers as a result of a Stay-to-Play policy, and a "Lowest Rate Guarantee" were false.

l. Whether Defendant omitted information regarding the nature of the mandatory fees it charged Plaintiffs and members of the Classes, the requirement to book hotel stays via TTS's platform in order for their children to participate in affiliated events, the reason for the Stay-to-Play policy, benefits to consumers as a result of a Stay-to-Play policy, and a "Lowest Rate Guarantee."

m. Whether Defendant's misrepresentations and omissions were material to Plaintiffs and members of the Classes.

n. Whether Defendant intentionally, knowingly, or recklessly made false representations to Plaintiffs and members of the Classes.

o. Whether Defendant's representations caused Plaintiffs and members of the Classes to book hotel stays via Defendant's platform.

p. Whether Defendant's conduct as detailed in this First Amended Complaint caused injury to Plaintiffs and members of the Classes.

q. The dates that Defendant charged mandatory fees to Plaintiffs and members of the Classes and any purported changes to those practices.

r. Whether Defendant's conduct detailed in this First Amended Complaint violated the KCPA.

s. Whether Plaintiffs and members of the Classes suffered ascertainable losses of money as a result of Defendant's conduct detailed in this First Amended Complaint.

t. Whether Defendant is liable for unjust enrichment.

u. Whether Plaintiffs and members of the Classes are entitled to equitable relief.

v. Whether Plaintiffs and members of the Classes are entitled to damages.

233. **Predominance:** These common issues predominate over individualized inquiries in this action because Defendant's liability can be established as to all members of the Classes as discussed herein.

234. **Typicality:** Plaintiffs' claims against Defendant and experiences with Defendant are typical, if not identical, to the claims and experiences of members of the Classes because, among other reasons, Plaintiffs' claims arise from Defendant's practices that are applicable to all members of the Classes.

235. **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Classes, as Plaintiffs and each member of the Classes lost money by paying mandatory fees to Defendant. Plaintiffs also have no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Classes.

236. **Superiority:** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that it will provide a realistic means for members of the Classes to recover damages; the damages suffered by members of the Classes may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Classes may be unaware that they have legal recourse for the conduct alleged herein; and because issues common to members of the Classes can be effectively managed in a single proceeding. Plaintiffs and their counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

237. Plaintiffs reserve the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## CAUSES OF ACTION

### First Cause of Action
**Kentucky Consumer Protection Act, KRS § 367.170 *et seq.* ("KCPA")**
***Brought by Kate Russell and Michelle Heinz on Behalf of Themselves and the Kentucky Subclass Members***

238. All preceding paragraphs are hereby incorporated by reference as if fully set forth

herein.

239. Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are unlawful in Kentucky.

240. Plaintiffs Kate Russell and Michelle Heinz and members of the Kentucky Subclass were "persons who purchase[d]" TTS's services within the meaning of KRS § 367.220(1) when they booked hotel accommodations via TTS's platform.

241. TTS was engaged in "trade" and "commerce" as defined by KRS § 367.110(2) when it offered and sold hotel reservation services to Plaintiffs Kate Russell and Michelle Heinz and members of the Kentucky Subclass.

242. TTS is a "person" as defined by KRS § 367.110(1).

243. Plaintiffs Kate Russell and Michelle Heinz and members of the Kentucky Subclass agreed to purchase TTS's services "primarily for personal, family, or household purposes" within the meaning of KRS § 367.220(1) when they booked hotel accommodations via TTS's platform in connection with participating in a TTS-affiliated event.

244. As detailed herein, at all relevant times, TTS engaged in unfair, false, misleading, or deceptive acts or practices within the meaning of KRS § 367.170 by misrepresenting the nature of the mandatory fees, falsely telling consumers that they were required to book hotel stays via TTS's platform in order for their children to participate in affiliated events, misrepresenting the reason for the Stay-to-Play policy, falsely claiming that consumers benefit from a Stay-to-Play policy, and by offering a "Lowest Rate Guarantee" that did not in fact guarantee the lowest rate on hotel stays. TTS engaged in these unlawful practices in connection with offering and selling hotel reservation services to Plaintiffs Kate Russell and Michelle Heinz and members of the Kentucky Subclass.

245. Plaintiffs Kate Russell and Michelle Heinz and members of the Kentucky Subclass reasonably relied on TTS's statement that they were required to reserve hotel rooms via TTS's platform in order for their children to participate in TTS-affiliated events.

246. Plaintiffs Kate Russell and Michelle Heinz and members of the Kentucky Subclass suffered ascertainable losses of money as a result of TTS's unfair, false, misleading, or deceptive acts or practices described herein as they paid mandatory fees to TTS and also paid higher prices for hotel accommodations because they booked rooms via TTS's platform as opposed to another platform or directly through hotels.

247. As detailed in this First Amended Complaint, at all relevant times, TTS willfully or knowingly engaged in the deceptive acts and practices described herein.

248. Plaintiffs Kate Russell and Michelle Heinz, on behalf of themselves and members of the Kentucky Subclass, seek equitable relief, including a permanent injunction to halt TTS's violations of the KCPA.

249. Plaintiffs Kate Russell and Michelle Heinz, on behalf of themselves and members of the Kentucky Subclass, further seek to recover their actual damages, punitive damages, and their reasonable attorneys' fees and costs.

## Second Cause of Action
**California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750–1784 ("CA CLRA")**
***Brought by Harmony Martin and Ashley Cali on Behalf of Themselves and the California Subclass Members***

250. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

251. Plaintiffs Harmony Martin, Ashley Cali, and members of the California Subclass were "consumers" within the meaning of California Civil Code §§ 1750–1784 ("CA CLRA") when they booked hotel accommodations via TTS's platform.

252. TTS's actions and conduct constituted transactions for the sale or lease of goods or services to consumers under the terms of the CA CLRA, namely the selling of hotel reservations and charging mandatory fees that were misrepresented to consumers.

253. TTS violated the CA CLRA by, among other things, making materially false statements and omitting truthful information about the requirement to make reservations through TTS and about the mandatory fees it charged Plaintiffs Harmony Martin, Ashley Cali, and members of the California Subclass.

254. TTS violated California Civil Code Section 1770(a)(9), which prohibits "[a]dvertising goods or services with intent not to sell them as advertised," by advertising hotel reservations with a "Lowest Rate Guarantee" that did not in fact guarantee the lowest rate on hotel stays.

255. Additionally, TTS violated the CA CLRA by:

a. "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve," Cal. Civ. Code § 1770(a)(14); and

b. "Representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction," Cal. Civ. Code § 1770(a)(17).

256. TTS's actions and misrepresentations were material, and TTS's violations of the CA CLRA were a substantial factor in causing Plaintiffs Harmony Martin, Ashley Cali, and members of the California Subclass to book hotel stays via TTS's platform and incur the mandatory fees that they paid to TTS.

257. As a direct and proximate consequence of these actions, Plaintiffs Harmony Martin, Ashley Cali, and members of the California Subclass suffered injury.

258. TTS's conduct was malicious, fraudulent, and wanton in that it intentionally and knowingly provided misleading information to Plaintiffs Harmony Martin, Ashley Cali, and members of the California Subclass for TTS's own benefit and to the detriment of Plaintiffs Harmony Martin, Ashley Cali, and members of the California Subclass.

259. Pursuant to California Civil Code Section 1780(d), declarations from Plaintiffs Harmony Martin and Ashley Cali are attached as Exhibit A, confirming that venue is proper.

260. Pursuant to California Civil Code Section 1782(a), Plaintiffs Harmony Martin and Ashley Cali, through their attorneys, sent a written demand for relief to TTS by certified mail and email on June 5, 2026, describing the unfair and deceptive acts and the injury that they and members of the California Subclass suffered. TTS confirmed receipt of the letter and responded. To date, however, TTS has refused to provide the relief requested to Plaintiffs Harmony Martin and Ashley Cali or the members of the California Subclass.

261. Accordingly, Plaintiffs Harmony Martin and Ashley Cali, on behalf of themselves and members of the California Subclass, seek all available remedies under the CLRA, including, without limitation, actual damages, punitive damages, statutory damages, restitution, injunctive and declaratory relief, and attorney's fees and costs.

## Third Cause of Action
**California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("CA UCL")**
***Brought by Harmony Martin and Ashley Cali on Behalf of Themselves and the California Subclass Members***

262. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

263. Plaintiffs Harmony Martin, Ashley Cali, and members of the California Subclass lack an adequate remedy at law.

264. In addition, or as an alternative to legal remedies sought herein, Plaintiffs Harmony Martin and Ashley Cali, on behalf of themselves and members of the California Subclass, seek equitable relief to the extent that legal remedies are inadequate.

265. The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

266. At all relevant times, by misrepresenting the nature of the mandatory fees, falsely telling consumers that they were required to book hotel stays via TTS's platform in order for their children to participate in affiliated events, misrepresenting the reason for the Stay-to-Play policy, falsely claiming that consumers benefit from a Stay-to-Play policy, and by offering a "Lowest Rate Guarantee" that did not in fact guarantee the lowest rate on hotel stays, TTS has violated the UCL.

267. A plaintiff may pursue a claim under the UCL through any or all of three prongs: the unlawful prong, the unfair prong, or the fraudulent prong.

268. TTS's acts and practices detailed herein violate the spirit and letter of numerous state statutory and common laws, including but not limited to fraud, fraudulent inducement, and the Causes of Action alleged in this First Amended Complaint.

269. TTS's acts and practices detailed herein constitute "unfair" business acts and practices under the UCL because TTS's conduct is unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous. Further, the gravity of TTS's conduct outweighs any conceivable benefit of such conduct.

270. TTS's acts and practices detailed herein constitute "unfair" business acts and practices under the UCL because TTS tricked Plaintiffs Harmony Martin, Ashley Cali, and

members of the California Subclass into paying mandatory fees by misrepresenting the nature of the fees, falsely claiming that consumers had no choice but to book lodging via TTS's platform in order for their children to participate in events, misrepresenting the reason for the Stay-to-Play policy, and falsely claiming that consumers benefit from a Stay-to-Play policy.

271. TTS's acts and practices detailed herein constitute "unfair" business acts and practices under the UCL because TTS unreasonably restrained competition for short-term lodging near affiliated Stay-to-Play events during and around the event dates. Because TTS misrepresented to Plaintiffs Harmony Martin, Ashley Cali, and members of the California Subclass that they were required to book lodging via TTS's platform, these consumers were unable to reserve hotel rooms through other third-party travel platforms or explore alternate lodging options, such as staying with family or friends, camping or renting an RV, renting a home or apartment via Airbnb or Vrbo, or staying in a hostel. This unfair restraint on competition resulted in higher prices charged to Plaintiffs Harmony Martin, Ashley Cali, and members of the California Subclass.

272. TTS's fraudulent acts and practices include its misrepresentations regarding the nature of the mandatory fees it charged Plaintiffs Harmony Martin, Ashley Cali, and members of the California Subclass, false claims that consumers were required to book hotel stays via TTS's platform in order for their children to participate in affiliated events, misrepresentations regarding the reason for the Stay-to-Play policy, false claims that consumers benefit from a Stay-to-Play policy, and false advertisements of a "Lowest Rate Guarantee" that did not in fact guarantee the lowest rate on hotel stays.

273. Plaintiffs Harmony Martin, Ashley Cali, and members of the California Subclass have suffered injury-in-fact, including the loss of money in the form of mandatory fees imposed

as well as higher prices for hotel stays, as a result of TTS's unlawful, unfair, and fraudulent practices.

274. TTS reaped unjust profits and revenues in violation of the UCL. In addition to the mandatory fees collected directly from Plaintiffs Harmony Martin, Ashley Cali, and members of the California Subclass, on information and belief TTS also earned profits and revenues from event and hotel partners. Plaintiffs Harmony Martin and Ashley Cali, on behalf of themselves and members of the California Subclass, seek restitution and disgorgement of these unjust profits and revenues.

275. Plaintiffs Harmony Martin, Ashley Cali, and members of the California Subclass will continue to lose money and be injured by those acts and practices if the practices described in this First Amended Complaint are not enjoined.

276. Plaintiffs Harmony Martin and Ashley Cali, on behalf of themselves and members of the California Subclass, seek an order providing restitution and disgorgement of all mandatory fees paid to TTS.

277. Plaintiffs Harmony Martin and Ashley Cali, on behalf of themselves and members of the California Subclass, further seek their attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5 because Plaintiffs Harmony Martin and Ashley Cali seek to enforce "an important right affecting the public interest" in bringing this cause of action. This case is a matter of public interest because TTS's acts and practices as described in this First Amended Complaint contributed to the rising cost of youth sports, forced consumers to pay inflated hotel rates and junk fees for which they received no benefit in return, had the effect of restraining competition for short-term lodging near affiliated Stay-to-Play events during and around the event

dates, and deprived consumers of the freedom to choose their hotel accommodations or other type of lodging when they traveled for competitions and tournaments.

**Fourth Cause of Action**
**California False Advertising Law, Cal. Bus. & Prof. § 17500 *et seq.* ("CA FAL")**
***Brought by Harmony Martin and Ashley Cali on Behalf of Themselves and the California Subclass Members***

278. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

279. At all relevant times and in violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*, TTS's advertisements, policies, acts, and practices described in this First Amended Complaint were designed to induce Plaintiffs Harmony Martin, Ashley Cali, and members of the California Subclass to book hotel stays via TTS's platform and to cause them to pay mandatory fees to TTS, and did in fact result in Plaintiffs Harmony Martin, Ashley Cali, and members of the California Subclass booking hotel stays via TTS's platform and paying unlawful fees to TTS.

280. TTS knew or reasonably should have known that its representations described in this First Amended Complaint were false and deceptive.

281. Specifically, as alleged in this First Amended Complaint, TTS's unfair, unconscionable, deceptive acts, practices, omissions, and/or affirmative misstatements include, but are not limited to advertising a "Lowest Rate Guarantee" that did not in fact guarantee the lowest rate on hotel stays.

282. As a result, Plaintiffs Harmony Martin, Ashley Cali, and members of the California Subclass are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which TTS was unjustly enriched.

283. Plaintiffs Harmony Martin and Ashley Cali, on behalf of themselves and members of the California Subclass, further seek their attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5 because Plaintiffs Harmony Martin and Ashley Cali seek to enforce "an important right affecting the public interest" in bringing this cause of action. This case is a matter of public interest because TTS's acts and practices as described in this First Amended Complaint contributed to the rising cost of youth sports, forced consumers to pay inflated hotel rates and junk fees for which they received no benefit in return, had the effect of restraining competition for short-term lodging near affiliated Stay-to-Play events during and around the event dates, and deprived consumers of the freedom to choose their hotel accommodations or other type of lodging when they traveled for competitions and tournaments.

**Fifth Cause of Action**

**New York General Business Law § 349 (Deceptive Acts and Practices) ("NY GBL § 349")**

***Brought by Jennifer Costello on Behalf of Herself and the New York Subclass Members***

284. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

285. TTS was engaged in consumer-oriented conduct when it offered and sold hotel reservation services to Plaintiff Jennifer Costello and members of the New York Subclass.

286. At all relevant times, TTS engaged in materially misleading conduct when it misrepresented the nature of the mandatory fees it charged Plaintiff Jennifer Costello and members of the New York Subclass, falsely told consumers that they were required to book hotel stays via TTS's platform in order for their children to participate in affiliated events, misrepresented the reason for the Stay-to-Play policy, falsely claimed that consumers benefit from a Stay-to-Play policy, and offered a "Lowest Rate Guarantee" that did not in fact guarantee the lowest rate on hotel stays.

287. TTS's misrepresentations and omissions detailed in this First Amended Complaint were likely to mislead a reasonable consumer acting reasonably under the circumstances and did in fact mislead Plaintiff Jennifer Costello and members of the New York Subclass.

288. Plaintiff Jennifer Costello and members of the New York Subclass have suffered injury-in-fact, including the loss of money in the form of mandatory fees imposed as well as higher prices for hotel stays as a result of TTS's unlawful and deceptive acts and practices.

289. Plaintiff Jennifer Costello, on behalf of herself and members of the New York Subclass, seeks to enjoin TTS from continuing to engage in deceptive acts and to recover actual damages or $50.00 per violation of NY GBL § 349, whichever is greater.

290. As detailed in this First Amended Complaint, TTS willfully or knowingly engaged in the deceptive acts and practices described herein. As such, Plaintiff Jennifer Costello, on behalf of herself and members of the New York Subclass, seeks treble damages up to $1,000 per violation of NY GBL § 349.

291. Plaintiff Jennifer Costello, on behalf of herself and members of the New York Subclass, further seeks her reasonable attorneys' fees and costs.

**Sixth Cause of Action**
**New York General Business Law § 350 (False Advertising) ("NY GBL § 350")**
***Brought by Jennifer Costello on Behalf of Herself and the New York Subclass Members***

292. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

293. TTS was engaged in consumer-oriented conduct when it advertised a "Lowest Rate Guarantee" in connection with offering hotel reservation services to Plaintiff Jennifer Costello and members of the New York Subclass.

294. TTS engaged in materially false advertising when it advertised a "Lowest Rate Guarantee" that did not in fact guarantee the lowest rate on hotel stays. TTS's "guarantee" is illusory because the rate TTS uses for comparison does not factor in the mandatory fees, and the "guarantee" does not apply to rates offered by other third-party platforms. Additionally, as described in this First Amended Complaint, even when consumers are able to find a lower rate by booking directly with the hotel, TTS's "guarantee" does not result in a downward price adjustment for consumers and instead operated as a price floor as opposed to a price ceiling.

295. TTS's false advertising as detailed in this First Amended Complaint was likely to mislead a reasonable consumer acting reasonably under the circumstances and did in fact mislead Plaintiff Jennifer Costello and members of the New York Subclass.

296. Plaintiff Jennifer Costello and members of the New York Subclass have suffered injury-in-fact, including the loss of money in the form of mandatory fees imposed by TTS, as well as higher prices for hotel stays. Plaintiff Jennifer Costello and members of the New York Subclass booked hotel accommodations via TTS's platform based on the false promise that they were guaranteed the lowest rate as a direct result of TTS's false advertising.

297. Plaintiff Jennifer Costello, on behalf of herself and members of the New York Subclass, seeks to enjoin TTS from continuing to engage in false advertising and to recover actual damages or $500.00 per violation of NY GBL § 350, whichever is greater.

298. As detailed in this First Amended Complaint, TTS willfully or knowingly engaged in the false advertising described herein. Plaintiff Jennifer Costello, on behalf of herself and members of the New York Subclass, seeks treble damages up to $10,000 per violation of NY GBL § 350.

299. Plaintiff Jennifer Costello, on behalf of herself and members of the New York Subclass, further seeks her reasonable attorneys' fees and costs.

**<u>Seventh Cause of Action</u>**
**Oklahoma Consumer Protection Act,**
**2025 Oklahoma Statutes § 15-751 *et seq.* ("OK CPA")**
***Brought by Aleisha Kelley on Behalf of Herself and the Oklahoma Subclass Members***

300. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

301. The Oklahoma Consumer Protection Act ("OK CPA"), 2025 Oklahoma Statutes § 15-751 *et seq.*, provides protection to consumers by declaring deceptive and unfair trade practices unlawful.

302. Plaintiff Aleisha Kelley, members of the Oklahoma Subclass, and TTS are all "persons" as defined by 15 O.S. § 752(1).

303. The transactions for hotel reservations via TTS's platform described herein constitute "consumer transactions" as defined by 15 O.S. § 752(2).

304. Hotel reservation services constitute "merchandise" under the meaning of section 15 O.S. § 752(7), which includes services.

305. TTS's website references to its purported "Lowest Rate Guarantee" are "advertisements" as defined by 15 O.S. § 752(9).

306. TTS's false and deceptive representations regarding Stay-to-Play policies and the requirement that consumers make hotel reservations via TTS's platform, as well as TTS's practice of imposing mandatory fees in connection with those reservations and misrepresenting the nature of those fees constitute "deceptive trade practices" and "unfair trade practices" as defined by 15 O.S. § 752(13)-(14).

307. TTS's practices as described herein are "unlawful practices" under 15 O.S. § 753(21) because TTS misrepresented the nature of the mandatory fees it charged Plaintiff Aleisha Kelley and members of the Oklahoma Subclass, falsely told consumers that they were required to book hotel stays via TTS's platform in order for their children to participate in affiliated events, misrepresented the reason for the Stay-to-Play policy, falsely claimed that consumers benefit from a Stay-to-Play policy, and offered a "Lowest Rate Guarantee" that did not in fact guarantee the lowest rate on hotel stays.

308. TTS's practices as described herein are "unlawful practices" under 15 O.S. § 753(5) because TTS made false representations regarding the benefits of reserving hotel rooms via TTS, including misrepresentations that TTS would (a) provide access to discounted rates, (b) provide access to conveniently located hotels, and (c) provide more favorable cancellation policies than the standard hotel policies.

309. Plaintiff Aleisha Kelley and members of the Oklahoma Subclass reasonably believed TTS's misrepresentations detailed in this First Amended Complaint, and they were coerced into reserving hotel rooms via TTS and paying mandatory fees imposed by TTS for which they did not receive any benefit in return as a direct and proximate result of TTS's misrepresentations.

310. TTS's practices as described herein are "unlawful practices" under 15 O.S. § 753(9) because TTS falsely advertised its purported "Lowest Rate Guarantee," which TTS did not honor even after Plaintiff Aleisha Kelley reported a lower, non-member rate at the same hotel. TTS engaged in materially false advertising when it advertised a "Lowest Rate Guarantee" that did not in fact guarantee the lowest rate on hotel stays. TTS's "guarantee" is illusory because the rate TTS uses for comparison does not factor in the mandatory fees, and the "guarantee" does not apply to

rates offered by other third-party platforms. Additionally, as described in this First Amended Complaint, even when consumers, including Plaintiff Aleisha Kelley, were able to find a lower rate by booking directly with the hotel, TTS's "guarantee" does not result in a downward price adjustment for consumers.

311. TTS's practices are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers because they contributed to the rising cost of youth sports, forced consumers to pay inflated hotel rates and junk fees for which they received no benefit in return, had the effect of restraining competition for short-term lodging near affiliated Stay-to-Play events during and around the event dates, and deprived consumers of the freedom to choose their hotel accommodations or other type of lodging when they traveled for competitions and tournaments.

312. TTS engaged in these unlawful practices intentionally, or with reason to know they were deceptive and unfair, within the active course of conducting its regular business operations.

313. TTS's unlawful, deceptive trade practices directly and proximately caused the consumer injury suffered by Plaintiff Aleisha Kelley and members of the Oklahoma Subclass.

314. As a direct result of TTS's unlawful acts, Plaintiff Aleisha Kelley and members of the Oklahoma Subclass were induced to and did in fact make hotel reservations via TTS's platform, which caused them to suffer out-of-pocket losses and actual damages in the total amount of mandatory fees they paid to TTS for which they did not receive any benefit in addition to inflated hotel prices that they paid to TTS-affiliated hotels.

315. Because TTS's deceptive practices were committed willfully, Plaintiff Aleisha Kelley and members of the Oklahoma Subclass are entitled to recover treble damages pursuant to 15 O.S. § 761.1(A).

316. Plaintiff Aleisha Kelley has been forced to retain legal counsel to prosecute this dispute and is therefore entitled to recover reasonable attorney's fees and all court costs under 15 O.S. § 761.1(A). Plaintiff Aleisha Kelley, on behalf of herself and members of the Oklahoma Subclass, seeks her reasonable attorneys' fees and costs.

**Eighth Cause of Action**
**Virginia Consumer Protection Act, Va. Code § 59.1-200 ("VA CPA")**
***Brought by Stacie Isaacs on Behalf of Herself and the Virginia Subclass Members***

317. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

318. TTS engaged in "consumer transaction[s]" with Plaintiff Stacie Isaacs and members of the Virginia Subclass when it advertised, offered for sale, and sold hotel reservation services to Plaintiff Stacie Isaacs and members of the Virginia Subclass.

319. Plaintiff Stacie Isaacs and members of the Virginia Subclass purchased TTS's services "primarily for personal, family, or household purposes" within the meaning of Virginia Code § 59.1-198 when they booked hotel accommodations via TTS's platform in connection with participating in a TTS-affiliated event.

320. TTS was a "supplier" within the meaning of Virginia Code § 59.1-198 when it offered and sold hotel reservation services to Plaintiff Stacie Isaacs and members of the Virginia Subclass.

321. As described in detail in this First Amended Complaint, TTS violated the VA CPA in numerous ways, including but not limited to violating the provisions of the VA CPA that prohibit: misrepresenting that services have certain characteristics or benefits (Virginia Code § 59.1-200(5)); advertising services with intent not to sell them as advertised or with intent not to sell upon the terms advertised (Virginia Code § 59.1-200(8)); and using any other deception, fraud,

false pretense, false promise, or misrepresentation in connection with a consumer transaction (Virginia Code § 59.1-200(14)).

322. Plaintiff Stacie Isaacs, on behalf of herself and members of the Virginia Subclass, seeks to enjoin TTS from continuing to engage in the deceptive acts or practices described throughout this First Amended Complaint and to recover actual damages or $500.00 per violation of the VA CPA, whichever is greater.

323. As detailed in this First Amended Complaint, TTS willfully engaged in the deceptive acts and practices described herein. As such, Plaintiff Stacie Isaacs, on behalf of herself and members of the Virginia Subclass, also seeks treble damages or $1,000.00 per violation of the VA CPA, whichever is greater.

324. Plaintiff Stacie Isaacs, on behalf of herself and members of the Virginia Subclass, further seeks her reasonable attorneys' fees and costs.

**Ninth Cause of Action**
**Massachusetts General Laws Chapter 93A ("MCPA")**
***Brought by Diana Ferrara on Behalf of Herself and the Massachusetts Subclass Members***

325. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

326. Plaintiff Diana Ferrara, members of the Massachusetts Subclass, and TTS are each a "person" as defined under Mass. Gen. Laws Ann. ch. 93A ("MCPA"), § 1(a).

327. At all times herein, TTS was engaged in "trade" and "commerce" as defined under MCPA § 1(b).

328. The MCPA prohibits and declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." MCPA § 2(a).

329. By the conduct complained of in this First Amended Complaint, TTS willfully and knowingly committed unfair and deceptive acts in violation of the MCPA § 2, including but not limited to its use of false and misleading statements to coerce Plaintiff Diana Ferrara and members of the Massachusetts Subclass into making hotel reservations through TTS's platform, then charging them unavoidable fees for which they did not receive any benefit in return.

330. TTS's business acts and practices are unconscionable, immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff Diana Ferrara and members of the Massachusetts Subclass because they cause harm and injury in fact to Plaintiff Diana Ferrara and members of the Massachusetts Subclass, and TTS lacks reasonable and legitimate justification for deceiving consumers and imposing mandatory fees that provide no benefit to consumers. TTS's business acts and practices are also unconscionable, immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff Diana Ferrara and members of the Massachusetts Subclass because they contributed to the rising cost of youth sports, forced consumers to pay inflated hotel rates, had the effect of restraining competition for short-term lodging near affiliated Stay-to-Play events during and around the event dates, and deprived consumers of the freedom to choose their hotel accommodations or other type of lodging when they traveled for competitions and tournaments.

331. TTS has benefited from its practice of deceptively coercing consumers into making hotel reservations via its platform and charging consumers mandatory fees, while Plaintiff Diana Ferrara and members of the Massachusetts Subclass have suffered because they were forced to pay inflated hotel costs and additional junk fees imposed by TTS and were deprived of their freedom to choose their preferred lodging. But for TTS's acts and practices, Plaintiff Diana Ferrara and members of the Massachusetts Subclass could have stayed with family or friends, camped or

rented an RV, rented a home or apartment via Airbnb or Vrbo, stayed in a hostel, motel, or bed and breakfast, or stayed in hotels that were not affiliated with TTS.

332. TTS's acts and practices are deceptive within the meaning of the MCPA because they misled Plaintiff Diana Ferrara and members of the Massachusetts Subclass concerning (a) the requirement to reserve hotel rooms through TTS's platform, (b) the nature of and the reasons for the mandatory fees it charges, and (c) the true total cost of their hotel reservations by not including resort fees from the quoted total cost on their reservation summaries, as described in detail herein.

333. TTS's false and misleading representations and omissions described in this First Amended Complaint were material, and they were likely to and did mislead members of the public, including Plaintiff Diana Ferrara, and/or caused harm to the public interest because they contributed to the rising cost of youth sports, forced consumers to pay inflated hotel rates and junk fees for which they received no benefit in return, had the effect of restraining competition for short-term lodging near affiliated Stay-to-Play events during and around the event dates, and deprived consumers of the freedom to choose their hotel accommodations or other type of lodging when they traveled for competitions and tournaments.

334. Plaintiff Diana Ferrara and members of the Massachusetts Subclass have suffered injury-in-fact, including the loss of money as a result of TTS's deceptive, unfair and/or unlawful practices.

335. As a direct and proximate result of TTS's violations of the MCPA § 2, Plaintiff Diana Ferrara and members of the Massachusetts Subclass have suffered injury and damages as set forth in the preceding paragraphs.

336. Plaintiff Diana Ferrara, on behalf of herself and members of the Massachusetts Subclass, is entitled to bring this action under MCPA § 9(1) as a person injured by TTS's unfair or deceptive acts or practices in violation of MCPA § 2.

337. Plaintiff Diana Ferrara, on behalf of herself and members of the Massachusetts Subclass, seeks all monetary and non-monetary relief allowed by law, including actual damages; treble damages for the willful or knowingly unfair and deceptive conduct alleged herein; disgorgement and restitution of all profits and benefits stemming from TTS's unconscionable and deceptive business practices; declaratory relief; reasonable attorneys' fees and costs; injunctive relief; and other appropriate equitable relief.

338. Pursuant to MCPA § 9(3), Plaintiff Diana Ferrara, through her attorneys, sent a written demand for relief to TTS by email on June 24, 2026, describing the unfair and deceptive acts and the injury she suffered. TTS did not make a reasonable written tender of settlement in response to her demand.

**<u>Tenth Cause of Action</u>**
**Illinois Consumer Fraud and Deceptive Business Practices Act,**
**815 ILCS §§ 505/1 *et seq.* ("ICFA")**
***Brought by Nicole Ledvina on Behalf of Herself and the Illinois Subclass Members***

339. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

340. The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1 *et seq.*, provides protection to consumers by mandating fair competition in commercial markets for goods and services.

341. The ICFA is a public interest statute.

342. The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising,

misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act." 815 ILCS § 505/2.

343. The ICFA applies to TTS's acts as described herein because it applies to transactions involving the sale of goods or services to consumers.

344. TTS is a "person" as defined by section 505/1(c) of the ICFA.

345. Plaintiff Nicole Ledvina and members of the Illinois Subclass are "consumers" as defined by section 505/1(e) of the ICFA.

346. Hotel reservations constitute "merchandise" under the meaning of section 505/1(b). The sale of hotel reservations made by TTS is within the meaning of "trade" or "commerce" under the ICFA.

347. TTS's misrepresentations and omissions regarding Stay-to-Play policies and the requirement to reserve hotel rooms through TTS' platform, as well as the practice of charging mandatory fees in connection with those reservations, are deceptive and unfair acts or practices prohibited by Chapter 2 of the ICFA.

348. TTS violated the ICFA when it misrepresented and omitted facts regarding Stay-to-Play policies because TTS told all parents of participating athletes that their children would not be permitted to compete if they did not make a hotel reservation through TTS. In reality, athletes were permitted to participate in Stay-to-Play events even if their parents did not make a hotel reservation via TTS's platform.

349. Plaintiff Nicole Ledvina and members of the Illinois Subclass relied upon TTS's misrepresentations regarding the requirement that they make hotel reservations through TTS so that their children would be able to participate in sports tournaments and competitions.

350. If Plaintiff Nicole Ledvina and members of the Illinois Subclass had been aware that they were not in fact required to make hotel reservations via TTS's platform, they would not have reserved hotel rooms through TTS and thus would have avoided paying mandatory fees to TTS on top of inflated hotel rates.

351. Plaintiff Nicole Ledvina's and members of the Illinois Subclass's expectations that they were required to make hotel reservations via TTS's platform were reasonable due to TTS's misrepresentations and omissions concerning Stay-to-Play policies and mandatory housing requirements, as described herein.

352. TTS's misrepresentations and omissions were and are likely to mislead Plaintiff Nicole Ledvina and members of the Illinois Subclass acting reasonably under the circumstances, and thus constitute unfair and deceptive trade practices in violation of the ICFA.

353. TTS repeated the acts of which Plaintiff Nicole Ledvina complains prior to the specific acts that relate to her allegations. As evidenced by all of the named plaintiffs' allegations, TTS engaged in a campaign of deception to coerce consumers into making hotel reservations through its platform and extract as much money as possible from them in mandatory fees. Every reservation made through TTS's website constituted a repeated bad act.

354. TTS knew that it misrepresented Stay-to-Play requirements, failed to disclose that not every athlete needed to be associated with a TTS reservation to participate in TTS-affiliated events, charged junk fees on every reservation, and misrepresented the nature of those fees. These misrepresentations and omissions relate to costs, which are highly relevant and material information to TTS's customers, and thus violated the ICFA.

355. As a direct and proximate result of TTS's violations of the ICFA, Plaintiff Nicole Ledvina and members of the Illinois Subclass have suffered harm in the form of monies paid to

TTS under the guise of meeting a Stay-to-Play requirement that TTS falsely claimed benefited them.

356. TTS's practices as set forth herein offend public policy, were and are immoral, unethical, oppressive, and unscrupulous, and cause substantial injury to consumers. By deceptively coercing parents to make hotel reservations through TTS and imposing junk fees with each reservation, which did not benefit consumers, TTS willfully deceived their customers and enriched itself at the cost of Plaintiff Nicole Ledvina and members of the Illinois Subclass.

357. TTS's practices as set forth herein are also offensive to public policy, immoral, unethical, oppressive, and unscrupulous, and cause substantial injury to consumers because they contributed to the rising cost of youth sports, forced consumers to pay inflated hotel rates and junk fees for which they received no benefit in return, had the effect of restraining competition for short-term lodging near affiliated Stay-to-Play events during and around the event dates, and deprived consumers of the freedom to choose their hotel accommodations or other type of lodging when they traveled for competitions and tournaments.

358. Plaintiff Nicole Ledvina, on behalf of herself and members of the Illinois Subclass, seeks an order (a) requiring TTS to cease the deceptive and unfair practices described herein; (b) requiring TTS to clearly disclose that athletes are not required to make hotel reservations through TTS's platform; (c) requiring TTS to cease the imposition of mandatory fees; (d) awarding compensatory, punitive, and exemplary damages, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable; and/or (e) requiring TTS to restore to Plaintiff Nicole Ledvina and members of the Illinois Subclass any money that TTS acquired by means of unfair competition (restitution).

**<u>Eleventh Cause of Action</u>**
**Unjust Enrichment**
***Brought in the Alternative to Legal Claims by Plaintiffs on Behalf of Themselves and Nationwide Class Members***

359. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

360. In the alternative, and to the extent that Plaintiffs and members of the Nationwide Class lack an adequate remedy at law, Plaintiffs assert a cause of action for unjust enrichment pursuant to Kentucky law on behalf of themselves and members of the Nationwide Class.

361. The mandatory fees paid to TTS by Plaintiffs and members of the Nationwide Class conferred a benefit upon TTS at the expense of Plaintiffs and members of the Nationwide Class.

362. TTS appreciated the benefit of the mandatory fees paid by Plaintiffs and members of the Nationwide Class insofar as it was enriched by the fees paid by Plaintiffs and members of the Nationwide Class.

363. Given that TTS received the mandatory fees in connection with a transaction induced by TTS's misrepresentations regarding the nature of the fees, false claims that consumers were required to book hotel stays via TTS's platform in order for their children to participate in affiliated events, misrepresentations regarding the reason for the Stay-to-Play policy, false claims that consumers benefit from a Stay-to-Play policy, and an illusory "Lowest Rate Guarantee," it would be inequitable to allow TTS to retain the benefit of the mandatory fees without payment to Plaintiffs and members of the Nationwide Class for the value of those fees.

364. Even if there were some justification for TTS imposing a "booking fee," it would be inequitable to allow TTS to retain the benefit of any per night booking fees charged beyond one night for each reservation because there is no justification for charging hotel booking fees based on the number of nights in a reservation as opposed to the number of reservation transactions.

Similarly, it would be inequitable for TTS to retain the benefit of increased booking fees for multiple rooms that were booked in a single transaction because there is no justification for applying booking fees based on the number of rooms reserved as opposed to the number of reservation transactions.

365. There is no justification for imposing an added "housing fee" on a hotel stay. It would be inequitable to allow TTS to retain the benefit of any "housing fee" paid by Plaintiffs and members of the Nationwide Class.

366. There is no justification for imposing an added "cancel convenience fee" that does not provide any benefit to consumers because it does not alter standard hotel cancellation policies. It would be inequitable to allow TTS to retain the benefit of any "cancel convenience fee" paid by Plaintiffs and members of the Nationwide Class.

367. There is no justification for imposing an added "cancel convenience fee" for reservations that also included the optional "Housing Protection" because, according to TTS, the "Housing Protection" fee provided consumers with an "upgrade[d]" level of "protection" for their reservations. It would be inequitable to allow TTS to retain the benefit of any "cancel convenience fee" paid by Plaintiffs and members of the Nationwide Class who also paid the "Housing Protection" fees in connection with the same reservations.

368. In addition to the mandatory fees collected directly from Plaintiffs and members of the Nationwide Class, on information and belief TTS also earned profits and revenues from event and hotel partners as a result of Plaintiffs and members of the Nationwide Class reserving hotel rooms via TTS's platform. It would be inequitable to allow TTS to retain these profits and revenues. Accordingly, Plaintiffs, on behalf of themselves and members of the Nationwide Class, seek restitution and disgorgement of these unjust profits and revenues.

## JURY DEMAND

Plaintiffs are entitled to and respectfully demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Classes seek an Order:

a. Certifying the proposed Classes pursuant to Rule 23, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

b. Declaring that Defendant is financially responsible for notifying the members of the Classes of the pendency of this suit;

c. Declaring that Defendant has committed the violations of law alleged herein;

d. Providing for any and all injunctive relief the Court deems appropriate;

e. Awarding statutory damages in the maximum amount for which the law provides;

f. Awarding monetary damages, including but not limited to any compensatory, incidental, consequential, or treble damages in an amount that the Court or jury will determine, in accordance with applicable law;

g. Providing for any and all equitable monetary relief the Court deems appropriate;

h. Awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

i. Awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

j. Awarding pre- and post-judgment interest to the extent the law allows; and

k. Providing such further relief as this Court may deem just and proper.

DATED: July 29, 2026

Respectfully Submitted,

*/s/ Karen Dahlberg O'Connell*
Karen Dahlberg O'Connell*

**ALMEIDA LAW GROUP**
157 Columbus Avenue, 4th Floor
New York, NY 10023
Phone: (347) 395-5666
Karen@almeidalawgroup.com

Clark C. Johnson
Brian H. Meldrum
**KAPLAN JOHNSON ABATE & BIRD LLP**
710 W. Main St., 4th Floor
Louisville, KY 40202
Phone: (502) 416-1630
cjohnson@kaplanjohnsonlaw.com
bmeldrum@kaplanjohnsonlaw.com

Brandon M. Wise*
**PEIFFER WOLF CARR**
**KANE CONWAY & WISE, LLP**
One US Bank Plaza
Suite 1950
St. Louis, MO 63101
Phone: (314) 833-4827
bwise@peifferwolf.com

*Counsel for Plaintiffs*

**pro hac vice* application granted